[Cite as *Hacker v. House*, 2015-Ohio-4741.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

|  |  |  |
|---|---|---|
| DWAYNE HACKER, et al., | : | |
| | | CASE NO. CA2014-11-230 |
| Plaintiffs-Appellants/ | : | |
| Third-Party Defendants, | | O P I N I O N |
| | : | 11/16/2015 |
| - vs - | : | |
| | : | |
| VERNON HOUSE, et al., | | |
| | : | |
| Defendants-Appellees/ | | |
| Third-Party Plaintiffs. | : | |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CV2013-10-2752

Fred S. Miller, Baden & Jones Building, 246 High Street, Hamilton, Ohio 45011, for plaintiffs-appellants/third-party defendants

Lancer R. Weinrich, Jr., 1701 South Breiel Boulevard, Middletown, Ohio 45044, for defendants-appellees/third-party plaintiffs

**S. POWELL, P.J.**

{¶ 1} Plaintiffs-appellants, Dwayne and Kindra Hacker, appeal from the decision of the Butler County Court of Common Pleas denying their claims alleging adverse possession and prescriptive easement over real property owned by their neighbors, defendants-appellees, Vernon and Patricia House. For the reasons outlined below, we affirm.

{¶ 2} On October 2, 2013, the Hackers filed a complaint alleging adverse possession

and prescriptive easement over real property owned by their neighbors, the Houses. As alleged in the complaint, the dispute involves a small strip of real property immediately south of Elk Creek located in Wayne Township, Butler County, Ohio. Although both parties filed motions for summary judgment, the matter ultimately proceeded to a three-day bench trial that concluded on October 3, 2014. After denying the Hackers' motion to amend their complaint at trial to include an additional claim regarding a noncontiguous triangular portion of property not originally pled as part of their complaint, the trial court heard lengthy testimony from a number of witnesses and admitted evidence from both parties that can be generally summarized in relevant part as follows.

{¶ 3}  Quentin Hacker, Dwayne Hacker's grandfather, obtained an ownership interest in the Hacker family property in a series of transfers from various relatives beginning in 1975. However, in the summer of 1985, after Quentin got into a disagreement over the property with his then neighbors, Robert and Mary Pallman, the previous owners of the disputed property at issue in this case, the Pallmans filed suit against Quentin in the Butler County Court of Common Pleas. In describing what caused him to file suit, Robert Pallman testified Quentin had "bulldozed a roadway down into the creek * * * and dug it out where I had it filled in." Continuing, Pallman testified that he "filled it in because I was having too many kids and everything coming up there, jumping into that hole there, at the falls. And I didn't want them to hurt theirself [sic] and everything else, and have a lawsuit on my hands. * * * So I had it filled in. He went down there and dug it back out."

{¶ 4}  On May 28, 1987, the trial court issued a decision granting judgment to the Pallmans that prohibited the Hacker family from entering onto the disputed property now owned by the Houses.[1]  Specifically, the trial court held in that case:

---

1. It is undisputed that the Houses' property is located north of the Hackers' property and, pursuant to the legal description of the property, includes all of the disputed property at issue in this case. This was further confirmed

The Court finds that Elk Creek runs across the south part of [the Pallmans'] 11.513 acres, adjoining [Quentin Hacker's] 1.35 acres (along side of 1.35 acres of 149.50 feet, 474.60 feet and 159.25 feet). No part of Elk Creek runs over the 1.35 acres.

The Court finds that [Quentin Hacker], in the period July thru September, 1985, dumped excavated dirt into the creek of [the Pallmans'] property, but that [Quentin Hacker] has since removed said dirt. The Court finds that [Quentin Hacker] permitted and directed his licensees, employees, agents and contractors to go onto the land of [the Pallmans] for construction purposes and also for recreational purposes.

The Court finds that [the Pallmans] have no adequate remedy at law to prevent said trespass.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that [the Pallmans] recover costs of $43.54 from [Quentin Hacker].

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that [Quentin Hacker] be and hereby is enjoined permanently from going onto the land of [the Pallmans] for construction, recreational or any other purposes and he is also enjoined from permitting or directing his licensees, employees, agents and contractors to do the same.

*Pallman v. Hacker*, Butler C.P. No. CV85-10-1096, p. 3-4 (May 28, 1987).

{¶ 5} Despite the trial court's decision prohibiting the Hacker family from entering onto the disputed property, the Hackers claim they and their various friends and family members continued to use the property as they had done previously. This included general testimony that the Hacker family had several family gatherings, cookouts, "weekend getaways" and campouts on the disputed property, as well as testimony that they oftentimes swam and fished in the creek. There was also testimony that the Hacker family and friends mowed and maintained the disputed property, posted no trespassing signs, removed rocks and sand from the creek, planted trees and a garden, and placed trash cans, benches, a

---

by a 1994 survey of the property commissioned by the Hackers, as well as a 2009 survey of the property commissioned by the Houses.

hammock, bird feeders, bird houses, picnic tables, flower pots, and a storage trailer on the property.

{¶ 6} However, when asked if his visiting the property decreased in the early 1990s, Dwayne testified that "[w]hen Mom and Dad got a divorce, we didn't, I didn't go there as much." Dwayne then testified as follows:

> Q: Okay. So in the early-'90s, you stopped going to the property as frequently?
>
> A: Yeah. Maybe once, maybe twice a year at the most.
>
> Q: Okay. That time period you were going to the property once or twice a year, you said it began in the late-'80s early-'90s. When did that continue until?
>
> A: I'm really not sure. Early-'90s. After the divorce was over, I think. So I think that was '93 or '94.
>
> * * *
>
> Q: In that late-'80s early '90s period, you were only getting out to the property once or twice a year. What were you doing out there during those occasional trips you would make?
>
> A: I would just go out there occasionally, Kindra and I, probably just to reminisce or to occasionally to fish.
>
> Q: Anything else?
>
> A: No.

{¶ 7} Continuing, Dwayne testified that during the mid-1990s he only went to the property "every now and then" to discuss the possibility of building a house on the property with his father, Daniel Hacker. Dwayne further testified that the garden, bird feeders, bird houses, flower pots, and the stone walkway that led down to the creek were either removed, washed away, or not tended to after his grandfather got sick and passed away in 1998. Nevertheless, as Dwayne testified when asked about the disputed property, "We've used it. We've maintained it. We've entertained on it. And we've improved it the entire time that

Grandpa's owned it and when he bought it until the present and continue to improve it today."

{¶ 8} Daniel Hacker also testified at trial. It is undisputed that Daniel is the current owner of the Hacker property having purchased it from his late father, Quentin Hacker, on August 22, 1989. Similar to the testimony from his son Dwayne, Daniel testified that the Hacker family would use the property "as a summer camp" for family reunions and cookouts during the summer, and that they had also skated on the creek during the winter. Specifically, as it relates to the years 1991 to 1995, Daniel testified he removed rocks and sand from the creek, mowed and maintained the property and would spend the night in a motor home he parked in the driveway "all the time." Daniel, however, later clarified his testimony to mean at most "two times a month."

{¶ 9} Daniel further testified that he took his various girlfriends to the property during the early 1990s where they would have cookouts and birthday parties. Daniel also testified that he placed a storage trailer on the property during the early 1990s that supposedly extended onto a portion of the disputed property where it remained until 2013. Yet, although testifying that he later moved into a house that he built on the property in 2001, Daniel did not provide any additional testimony regarding the disputed property between the years 1996 and 2000.

{¶ 10} Daniel's daughter and Dwayne's sister, Stephanie Archer, further testified at trial. Stephanie testified that after Daniel moved out of the property, she and her now ex-husband leased the property from her father for three years between 2004 and 2007. Prior to that time, Stephanie testified she had visited the property "frequently" during the summer and fall months when she was a child between the years 1987 to 1993. However, when questioned further, Stephanie stated that she actually visited the property only "three to five times in the summer" and "then maybe two to three times in the fall," and "we were there to take pictures and kind of walk around and look at the falls in the wintertime when they're iced

- 5 -

over and things like that."

{¶ 11} Stephanie also testified she and her friends and family members would swim, fish, ride four-wheelers, have bonfires, cookouts, picnic, and help pick up sticks and trash on the property. In addition, Stephanie testified that she remembered her grandfather, Quentin, calling the police "maybe four or five times" to have trespassers ejected from the property. Stephanie further testified that she took her friends to the property only "four to five times in the summer" and "maybe two or three times in the fall" during the years 1994 and 1998. This was in addition to the only two or three times the property was used during the summer for other Hacker family functions. Stephanie also testified that she had seen a hammock, bird feeders, and picnic tables on the disputed property. Stephanie did not provide any additional testimony regarding the disputed property between the years 1998 and when she moved onto the property in 2004.

{¶ 12} Daniel Hacker's foster brother, Charles Rosenbalm, then testified at trial. Rosenbalm testified that he had been to the property numerous times as a child where he would mow grass, pick up sticks, rode a mini-bike and tractor on the property, and camped and fished in the creek. However, during the 1990s, Rosenbalm testified he only went to the property in the summer "probably twice a month" to camp and "probably three times a month, give or take," to mow the grass. Rosenbalm further testified that there were two horseshoe pits on the property, but that they were eventually grown over in the late 1990s.

{¶ 13} Robert Pallman also testified at trial. As noted above, the Pallmans owned the property until 2004 prior to it being sold to the Houses in 2005. During this time, Pallman testified he placed no trespassing signs on the disputed property and frequently attempted to eject trespassers from the property. Pallman also testified that he did not see any steps leading down to the creek, did not see anybody picking up trash along the creek, did not see anybody mowing grass, planting trees, or landscaping any portion of the disputed property.

Pallman further testified he did not see any picnic tables, benches, bird feeders, bird houses, chairs, flower pots, hammocks, or garbage cans on the disputed property.

{¶ 14} Moreover, when asked if he had ever seen any swings on the disputed property, Pallman testified, "[w]ell, somebody put a rope up down there in the creek, but I mean, so they could swing out and drop in the falls down there. We got rid of it." Pallman then testified in regards to the storage trailer the Hackers alleged to have been placed on the disputed property:

> Q: At the top of that bluff, did you ever see a semi-trailer up there?
>
> A: Yeah.
>
> Q: Was it on your property?
>
> A: No.
>
> Q: Was that trailer hanging over the bluff?
>
> A: No.
>
> Q: If it had been on your property, would you have done anything about it?
>
> A: They'd have moved it.

Concluding, Pallman testified that he never gave anybody permission to use any portion of the disputed property.

{¶ 15} After both parties rested, the trial court issued its decision from the bench denying the Hackers' claims alleging adverse possession and prescriptive easement. In so holding, the trial court found the Hackers had met their burden and proved by clear and convincing evidence that they had possessed and used the disputed property in an open, notorious and adverse manner. However, the trial court also found the Hackers had failed to prove they had possessed or used the disputed property exclusively and continuously for the necessary 21-year period. Specifically, as the trial court found in regards to the Hackers'

alleged continuous possession and use of the property:

> I was looking back over this and I was looking at the testimony, and my notes of the testimony, and as a finder of fact, I have to decide how much of this was used and how was it used over this 21-year period. And it really doesn't make any difference whether I take the first 21-years of whether I take the last 21-years from 1987 to 2014. It really doesn't make a difference. The problem is in the '90s as I see it.

> * * *

> So, who was going, who was there, what was happening? Well [Daniel Hacker's ex-wife] was out of the picture pretty much as far as this land is concerned in the '90s and thereafter until recently, until Dwayne and Kindra had moved in and their family. So who was there? Well we got Stephanie and we got Daniel himself. I don't think Daniel was real thrilled with being the landowner and having all that, and he wasn't Quentin, it seems to me. He wasn't the kind of guy Quentin was. He wasn't the thrilled guy to be out there all the time, doing all the stuff on the land. He was a different sort of guy and that's not his bit, it seems to me. I'm the fact finder here and as I say, you know, I have to read between the lines a little bit because I've got to figure out what was the usage in the '90s. Who was there, what were they doing, how were they using the land?

> And that's the weakness for me in the Plaintiffs' case. Stephanie was out some. I mean there was no house there until 2001, so, you know, so, I mean, it wasn't like – I don't think she was spending many nights or anything. She'd go out with her friends some on the weekends like Dwayne would do about seven or eight years earlier when he was in his teen years, and she would be out there a little bit once [in] a while with friends and some family.

> But what's continuous? And that's what I'm grappling with here. That's what I'm grappling. Is that continuous usage of this land like owners use land to, you know, two or three time[s] in the summer go out, you know, party a little bit. Maybe a couple of times in the fall before it gets too cold. Have about six months go by and not be there at all. I think that's not continuous and that's where I'm coming down. That's really the essence of my decision here. I think during that time period we don't have a whole lot of usage.

> * * *

> In the case law as far as I know there's no, you know,

continuous. I guess I didn't get to that. Just, and the very few comments that I came up with that are that significant here, but continuous means no substantial interruption for 21 years. It does say daily or weekly use is not required, and I certainly understand that, as long as the use shown is continuous enough to indicate a prolonged and substantial use. And that's it. That's the rub for me in [the Hackers'] case. I don't think that [the Hackers] can show that there was prolonged and substantial use during a lot of the '90s.

The trial court then incorporated its findings denying the Hackers' claims alleging adverse possession and prescriptive easement into a judgment entry issued on October 24, 2014.

{¶ 16} The Hackers now appeal from the trial court's decision, raising three assignments of error for review. The Houses also raised one cross-assignment of error for review.

{¶ 17} The Hackers' Assignment of Error No. 1:

{¶ 18} THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANTS WHEN IT CONCLUDED THAT THEY HAD NOT PROVED ALL THE ELEMENTS OF ADVERSE POSSESSION.

{¶ 19} In their first assignment of error, the Hackers argue the trial court erred by finding they failed to prove their claim alleging adverse possession of the disputed property. We disagree.

{¶ 20} The doctrine of adverse possession is disfavored in the law. *Houck v. Bd. of Park Commrs. of Huron Cty. Park Dist.*, 116 Ohio St.3d 148, 2007-Ohio-5586, ¶ 29. "To acquire real property by adverse possession, a party must establish, by clear and convincing evidence, that [the party] has possessed the land in an open, notorious, exclusive, adverse, and continuous manner for at least 21 years." *Vaughn v. Johnston*, 12th Dist. Brown No. CA2004-06-009, 2005-Ohio-942, ¶ 9, citing *Grace v. Koch*, 81 Ohio St.3d 577, 579 (1998). The legal titleholder is entitled to a strong presumption that he is the legal owner of the property. *Judd v. Jackson*, 12th Dist. Butler No. CA2002-11-291, 2003-Ohio-6383, ¶ 9. "The

burden of establishing the elements necessary to acquire title by adverse possession rests heavily upon the person claiming such ownership." *Bonham v. Hamilton*, 12th Dist. Butler No. CA2006-02-030, 2007-Ohio-349, ¶ 11. "Failure to prove any one of the elements by clear and convincing evidence results in failure to acquire title by adverse possession." *Crown Credit Co., Ltd. v. Bushman*, 170 Ohio App.3d 807, 2007-Ohio-1230, ¶ 31 (3d Dist.).

{¶ 21} "An appeal of a ruling on an adverse possession claim is usually reviewed under a 'manifest weight of the evidence' standard of review." *Nolen v. Rase*, 4th Dist. Scioto No. 13CA3536, 2013-Ohio-5680, ¶ 9. In considering a manifest weight challenge, a reviewing court weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created a manifest miscarriage of justice warranting reversal and a new trial ordered. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. A judgment will not be reversed as being against the manifest weight of the evidence where the "judgment is supported by some competent, credible evidence going to all essential elements of the case." *Ashburn v. Roth*, 12th Dist. Butler Nos. CA2006-03-054 and CA2006-03-070, 2007-Ohio-2995, ¶ 26, citing *C.E. Morris Co. v. Foley Const. Co.*, 54 Ohio St.2d 279 (1978), syllabus.

{¶ 22} In this case, the parties do not dispute that the Hacker family possessed the disputed property in an open, notorious and adverse manner after the trial court issued its decision ejecting Dwayne's grandfather, Quentin Hacker, from the disputed property on May 28, 1987. In turn, although we may question the trial court's decision in this regard, the only issue truly raised by the parties is whether the trial court erred by finding the Hackers failed to prove the Hacker family had possessed the disputed property in an exclusive and continuous manner throughout the 1990s.

{¶ 23} To demonstrate continuous possession of the disputed property, "an adverse

claimant must show that there was no 'substantial interruption' in his use of the property." *Pottmeyer v. Douglas*, 4th Dist. Washington No. 10CA7, 2010-Ohio-5293, ¶ 37, quoting *Bullion v. Gahm*, 164 Ohio App.3d 344, 2005-Ohio-5966, ¶ 20 (4th Dist.). In other words, use of the disputed property that is neither interrupted by acts of the owner nor abandoned by the adverse user. *Dunn v. Ransom*, 4th Dist. Pike No. 10CA806, 2011-Ohio-4253, ¶ 99. Daily or weekly use, however, is not required. *Douglas* at ¶ 37. In turn, "[p]ossession of title to property in dispute on an adverse possession claim is not 'interrupted' so long as the parties' use of the property is continuous enough to indicate prolonged and substantial use." *Cronin v. Standish*, 6th Dist. Sandusky No. S-05-023, 2006-Ohio-4293, ¶ 23, citing *Ault v. Prairie Farmers Co-Operative Company*, 6th Dist. Wood No. WD-81-21, 1981 WL 5788, *2 (Sept. 25, 1981). In making such a determination, each case of adverse possession turns upon its own particular set of facts. *Enderle v. Zettler*, 12th Dist. Butler No. CA2005-11-484, 2006-Ohio-4326, ¶ 8.

{¶ 24} As noted above, the Hackers initially argue the trial court erred by finding they failed to prove they had continuously possessed the disputed property throughout the 1990s. However, just as the trial court found, we find the evidence presented at trial merely indicates the Hacker family possessed and used the disputed property sporadically with significant prolonged interruptions spanning many months or even years during the 1990s. For instance, while there was general testimony that the Hacker family had several family gatherings, cookouts, "weekend getaways" and campouts on the property, as well as some testimony that the Hacker family would oftentimes swim and fish in the creek, Dwayne Hacker testified that his visits to the property significantly decreased during his parents' divorce in the early 1990s. Dwayne's father, Daniel Hacker, also testified that although he had removed rocks from the creek, would occasionally mow and maintain the property, he had really only spent the night at the property at most "two times a month."

{¶ 25} Moreover, Daniel's daughter and Dwayne's sister, Stephanie Archer, also testified that she only visited the property during the early 1990s "maybe three to five times in the summer" and "then maybe two to three times in the fall," and "we were there to take pictures and kind of walk around and look at the falls in the wintertime when they're iced over and things like that." Stephanie further testified that she only took her friends to the property "four to five times in the summer" and "maybe two or three times in the fall" during the years 1994 and 1998. This was in addition to the only two or three times the property was used during the summer for other Hacker family functions.

{¶ 26} Finally, Charles Rosenbalm, Daniel Hacker's foster brother, testified he only went to the property in the summer "probably twice a month" to camp and "probably three times a month, give or take," to mow the grass during the 1990s. However, Robert Pallman, the owner of the disputed property throughout the 1990s, testified that he did not see any steps leading down to the creek, did not see anybody picking up trash along the creek, and did not see anybody mowing grass, planting trees, or landscaping any portion of the disputed property. Pallman further testified that he did not see any picnic tables, benches, bird feeders, bird houses, chairs, flower pots, hammocks, or garbage cans on the disputed property. This testimony was corroborated by the Hackers themselves who provided some testimony that the garden, bird feeders, bird houses, flower pots, horseshoe pits, and the stone walkway that supposedly led down to the creek were either removed, washed away, or not tended to after Quentin Hacker got sick and passed away in 1998.

{¶ 27} As this court has stated previously, "[a]dverse possession must be proved and will not be presumed." *Bravard v. Curran*, 155 Ohio App.3d 713, 2004-Ohio-181, ¶ 11 (12th Dist.) Moreover, where the evidence presented to the trial court is susceptible to more than one interpretation, such as the case here, "we are bound to give it the construction that is consistent with the trial court's judgment and finding of facts." *Estate of Everhart v. Everhart*,

12th Dist. Fayette Nos. CA2013-07-019 and CA2013-09-026, 2014-Ohio-2476, ¶ 26. This is particularly true here given the fact that this matter was tried to the bench for it is well-established that "'the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" *Mike Castrucci Ford Sales, Inc. v. Hoover*, 12th Dist. Clermont No. CA2007-02-022, 2008-Ohio-1358, ¶ 19, quoting *Seasons Coal Co., Inc. v. City of Cleveland*, 10 Ohio St.3d 77, 80 (1984).

{¶ 28} Therefore, because we find no error in the trial court's decision finding the Hackers failed to prove they possessed the disputed property in a continuous manner for the necessary 21-year period, but rather, merely possessed and used the disputed property sporadically with significant prolonged interruptions spanning many months or even years, we need not consider whether the trial court erred by finding the Hackers also failed to prove their possession of the disputed property was exclusive. Again, "[f]ailure to prove any one of the elements by clear and convincing evidence results in failure to acquire title by adverse possession." *Bushman*, 2007-Ohio-1230 at ¶ 31. Accordingly, the Hackers' first assignment of error is without merit and overruled.

{¶ 29} The Hackers' Assignment of Error No. 2:

{¶ 30} THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANTS WHEN IT FOUND THAT APPELLANTS WERE NOT ENTITLED TO USE THE DISPUTED LAND BY VIRTUE OF A PRESCRIPTIVE EASEMENT.

{¶ 31} In their second assignment of error, the Hackers argue the trial court erred by finding they had not proved their claim alleging a prescriptive easement on the disputed property. We again disagree.

{¶ 32} "Prescriptive easements are not favored in law, because the legal titleholder forfeits rights to another without compensation." *Cadwallader v. Scovanner*, 178 Ohio

- 13 -

App.3d 26, 2008-Ohio-4166, ¶ 9 (12th Dist.). Similar to a claim alleging adverse possession, to prove that a prescriptive easement exists, a party must show, by clear and convincing evidence, that the party has used the property openly, notoriously, adversely to the property rights of the servient estate's owner, and continuously for a period of at least 21 years. *McCumbers v. Puckett*, 183 Ohio App.3d 762, 2009-Ohio-4465, ¶ 15 (12th Dist.). In turn, the distinction between the elements required to acquire a prescriptive easement and those required to acquire title by adverse possession is limited to the exclusive use of the land. *Nusekabel v. Cincinnati Public School Employees Credit Union, Inc.*, 125 Ohio App.3d 427, 433-434 (1st Dist.1997). In other words, "[a]cquiring an easement by prescription differs from acquiring title by adverse possession, in that exclusivity is not an element required to establish an easement by prescription." *Johnston,* 2005-Ohio-942 at ¶ 11.

{¶ 33} Similarly to our holding above, we find no error in the trial court's decision finding the Hackers failed to prove they used the disputed property in a continuous manner for the necessary 21-year period. Again, just as the trial court found, the evidence presented at trial merely indicates the Hacker family possessed and used the disputed property sporadically with significant prolonged interruptions spanning many months or even years during the 1990s. However, a prescriptive easement "requires strict adherence to continual use for 21 years." *Scovanner,* 2008-Ohio-4166 at ¶ 23. "Failure to prove any element results in a failure to establish a prescriptive easement." *Simmons v. Trumbull Cty. Engineer*, 11th Dist. Trumbull No. 2007-T-0049, 2007-Ohio-6735, ¶ 21. Therefore, because we find no error in the trial court's decision finding the Hackers failed to prove they used the disputed property in a continuous manner for the necessary 21-year period, the Hackers second assignment of error is likewise without merit and overruled.

{¶ 34} The Hackers' Assignment of Error No. 3:

{¶ 35} THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANTS WHEN

IT DID NOT ALLOW THEM TO AMEND THE COMPLAINT IN ACCORDANCE WITH ISSUES NOT RAISED IN THE PLEADINGS.

{¶ 36} In their third assignment of error, the Hackers argue the trial court erred by denying their request to amend their complaint at trial pursuant to Civ.R. 15(B). Specifically, the Hackers argue the trial court erred by denying their request to include an additional claim regarding a noncontiguous triangular portion of property not originally pled as part of their complaint. We disagree.

{¶ 37} Civ.R. 15(B) allows for the amendment of pleadings to conform to the evidence presented at trial. *Stafford v. Aces & Eights Harley-Davidson, LLC*, 12th Dist. Warren No. CA2005-06-070, 2006-Ohio-1780, ¶ 19. Specifically, Civ.R. 15(B) provides that "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." However, Civ.R. 15(B) also provides that if the evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, such as the case here, "the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits." Courts may deny motions to amend where there is a showing of bad faith, undue delay, or undue prejudice to an opposing party. *Mitchell v. Lemmie*, 2d Dist. Montgomery No. 21511, 2007-Ohio-5757, ¶ 75.

{¶ 38} "The grant or denial of leave to amend a pleading is discretionary and will not be reversed on appeal absent a showing that the trial court abused its discretion." *Monroe v. Youssef*, 11th Dist. No. 2009-T-0012, 2012-Ohio-6122, ¶ 67, citing *State ex rel. Askew v. Goldhart*, 75 Ohio St.3d 608, 610 (1996). In order to find an abuse of discretion, this court must determine that the trial court's decision was unreasonable, arbitrary, or unconscionable,

and not merely an error of law or judgment. *Richards v. Newberry*, 12th Dist. Clermont No. CA2014-08-061, 2015-Ohio-1932, ¶ 15. "Deference is always due in an abuse-of-discretion case." *State ex rel. Nese v. State Teachers Retirement Bd. of Ohio*, 136 Ohio St.3d 103, 2013-Ohio-1777, ¶ 28.

**{¶ 39}** As the record reveals, the Houses immediately objected to Dwayne's testimony at trial regarding an additional claim to a noncontiguous triangular portion of property that was neither pled as part of the Hackers' complaint, nor raised as an issue through the Hackers' motion for summary judgment. After initially overruling the objection, the trial court later sustained the Houses' objection and limited the issues in the case to the disputed property originally pled as part of the Hackers' complaint. The Hackers' claim this was error given the fact that Dwayne testified regarding this additional noncontiguous triangular portion of property when asked about the disputed property during his deposition.

**{¶ 40}** However, simply because Dwayne may have discussed portions of property outside the disputed property alleged in the Hackers' complaint during his deposition does not mean the Houses should automatically assume that portion of property is in dispute and an issue to be litigated at trial. As the trial court aptly noted in denying the Hackers' request, "in depositions all kinds of questions may be asked and you're not that concerned with relevance of questions in depositions and there aren't objections to relevance." We find no error in the trial court's decision denying the Hackers' request to amend their complaint, nor do we find any error in the trial court's failure to sua sponte grant a continuance as the Hackers now suggest. *See, e.g., Mayo v. Bethesda Lutheran Communities*, 8th Dist. Cuyahoga No. 100637, 2014-Ohio-3499, ¶ 8-15. Simply stated, the Hackers could have easily moved to amend their complaint prior to trial rather than wait until after the trial had already begun to make such a request. Therefore, because we find no error in the trial court's decision, the Hackers' third assignment of error is also without merit and overruled.

{¶ 41} The Houses' Cross-Assignment of Error No. 1:

{¶ 42} THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLEES WHEN IT FAILED TO FIND THAT THE TWENTY-ONE YEAR STATUTE OF LIMITATIONS WAS TOLLED UPON THE TRUE OWNERS UNEQUIVOCAL MANIFESTATIONS OF INTENT TO RECLAIM THE DISPUTED PROPERTY.

{¶ 43} In their single cross-assignment of error, the Houses argue the trial court erred by not finding the "statute of limitations" was tolled prior to the expiration of the 21-year period necessary for both the Hackers' adverse possession and prescriptive easement claims. In light of our holdings above under the Hackers' first and second assignments of error, the Houses' single cross-assignment of error is rendered moot.

{¶ 44} Judgment affirmed.

RINGLAND and HENDRICKSON, JJ., concur.