[Cite as *Porter v. Porter*, 2020-Ohio-4504.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

|                          |     |                          |
| ------------------------ | --- | ------------------------ |
| TONITA PORTER,           |  :  |                          |
| Appellee,                |  :  | CASE NO. CA2019-11-185   |
|                          |  :  | O P I N I O N            |
| - vs -                   |     | 9/21/2020                |
|                          |  :  |                          |
| DAVID PORTER,            |  :  |                          |
| Appellant.               |  :  |                          |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
DOMESTIC RELATIONS DIVISION
Case No. DV19-03-0182

The Lampe Law Office, LLC, Lynn Lampe, 9277 Centre Pointe Drive, Suite 100, West Chester, Ohio 45069, for appellee

Cornetet, Meyer, Rush & Stapleton, Karen P. Meyer, 123 Boggs Lane, Cincinnati, Ohio 45246, for appellant

**HENDRICKSON, P.J.**

{¶1} Appellant, David Porter, appeals a decision of the Butler County Court of Common Pleas, Domestic Relations Division, granting a domestic violence civil protection order ("DVCPO") to appellee, Tonita Porter. For the reasons stated below, we affirm the

trial court's decision.[1]

{¶2} On March 26, 2019, Tonita petitioned for and was granted an ex parte protection order against her husband, David. In the petition, Tonita alleged that David had engaged in multiple acts of domestic violence since June of 2018, with the latest event occurring on February 22, 2019. With respect to the February 22, 2019 incident, Tonita stated that upon returning to the marital home in West Chester, Ohio following a dinner out, David asked her to look at his water bottle. David demanded that she put her eye to the bottle's opening and when she complied, David forcibly squeezed the bottle, sending water shooting into her eye. Tonita claimed that "it felt like it cut [her] eye" and that she was in pain. She got upset with David, who responded by calling Tonita names and telling her to "get over it." Tonita alleged that she picked up the water bottle and threw it at David. He responded by grabbing Tonita and throwing her into a door frame, causing her injury. Tonita alleged that her forehead was "sliced open" and she fell to the ground, where she lost consciousness for a few moments. Upon regaining consciousness, Tonita stated she went next door to a neighbor's home to get help as she was fearful of what David might do next.

{¶3} In addition to this incident, Tonita's petition asserted that near the end of November 2018, David choked her and told her he wished she was dead. On September 21, 2018, after getting jealous of attention Tonita had given another man, David grabbed her by the arm hard enough to leave bruises. At an outdoor concert on July 14, 2018, David accused Tonita of flirting with other men and shoved her forcibly into a chair, causing injury to the left side of her body. Tonita claimed she had trouble breathing, was heavily bruised, went to a hospital to get X-rays, and did not recover from the injuries for four weeks. In June 2018, after David screamed at her all night and called her names, Tonita went to the

---

1. Pursuant to Loc.R. 6(A), we sua sponte remove this case from the accelerated calendar for purposes of issuing this opinion.

emergency room because she believed she was having a heart attack. However, she found out she was having "anxiety attacks from the mental abuse."

{¶4} On May 29, 2019, a full hearing was held before a magistrate. At the hearing, both parties were represented by counsel. In support of her petition for a DVCPO, Tonita testified on her own behalf and presented testimony from her neighbor, Michelle Tieman. Tonita testified she and David had been married for less than two years and during the marriage, David was physically and mentally abusive towards her. She described a number of incidents where David was abusive towards her, noting that David "[m]ostly just [caused] bruising on the arms." However, she recalled one incident from July 14, 2018, where she had to go to the hospital because she had trouble breathing after David got jealous at a concert and pushed her into either a table or chair, injuring her ribs. At the hospital, Tonita did not report that David caused the injuries to her ribs because David had accompanied her to emergency room and she was scared to say anything in front of him.

{¶5} At a house party she and David threw on September 2, 2018, David got jealous when she danced with another man and he grabbed her arm. Tonita took a photograph of where David left a bruise on her arm, and the photograph was admitted into evidence. On another evening, Tonita recalled that while the two were in bed, David rolled over on top of her and started choking her while telling her he wished she was dead.

{¶6} Finally, with respect to the most recent event that occurred on February 22, 2019, Tonita explained that she and David had consumed alcoholic beverages while dinning out. Tonita testified that David was intoxicated when they arrived at their marital home. David had an open water bottle that he asked her to look at. When she went to look inside the bottle, David pushed her head down and "squeezed [the bottle] as hard as he could." Tonita stated that "a big flash of water * * * hit right into [her] eye," causing her eye to burn severely. She became upset and was crying from the pain, but David found the

incident hilarious and started making fun of her. Tonita threw the water bottle at David's face. David then approached her from behind, grabbed her shoulders, and threw her into a doorframe, causing the left side of her face to strike the doorframe. Tonita fell to the ground and lost consciousness for a period of time. When she regained consciousness, David was no longer at the marital home. Tonita's vision was blurred and she had blood on her face. She went into a bathroom and saw her forehead had been split open, she had a quarter-size hematoma on her face, and there were knots on the top of her head. Tonita stated she was "scared to death" and ran to Tieman's house to get help.

{¶7} Tieman took photographs of Tonita's injuries, and these photographs were admitted into evidence. Tieman called the police to report David's actions, but Tonita decided not to speak with the officers, stating "I [did not] know what to do. [I was] scared to death of him. He'll come back and hurt me again if he finds out that I've pressed charges or called the police on him." Tonita returned to her marital residence later that evening.

{¶8} Tonita testified that she is in fear of David and is "so scared of him" because she knows how strong and abusive he is. Tonita explained her fear of David kept her from reporting his actions to the police or filing a petition for a protection order prior to March 26, 2019. She stated, "It's the fear that was built up inside of me over this whole time[.] * * * [I]t was like every week he would blow up, or every other week, at me and tell me it was my fault, and uh – and at first, it was just bruises on my arms from grabbing my arms and stuff, but this last time scared me so bad. I would – I was shaking. I was always scared of him. And now I'm really scared 'cause I realize how bad I got hurt."

{¶9} Tieman testified that Tonita and David live across the street from her and that she and her husband frequently interacted with Tonita and David. Tieman had observed David's "control issues" in the past and had questioned Tonita about the bruises on her arms and her broken ribs. Tieman stated that Tonita always made excuses for her injuries

because she was afraid of David. Nonetheless Tieman believed David was mentally and physically abusive towards Tonita.

{¶10} Tieman testified that when Tonita appeared on her doorstep on February 22, 2019, it was "very visible that something had happened" and that Tonita was "shaken up." The first thing Tonita said to Tieman was, "[O]h my gosh, my head, my head, Dave did this to me." Tieman gave Tonita an icepack for her head and photographed the injuries to Tonita's face. Tieman called the police to report Tonita's injuries, but Tonita begged her not to report David because she "so afraid of what would happen." Tieman explained that Tonita left before the police arrived at Tieman's home. Once an officer arrived, Tieman spoke with him, but she did not disclose Tonita's name or address. The officer left domestic violence pamphlets, which Tieman took over to Tonita.

{¶11} In addition to the February 22, 2019 incident, Tieman testified that on one occasion Tonita asked her to come over to her house while David's son, Cory Porter, and Cory's girlfriend were visiting because Tonita was afraid of David's behavior. Tieman stated that David was acting very irrationally that night and that David, Cory, and Cory's girlfriend were all verbally attacking Tonita. Tieman stated that when she stood up for Tonita, David got very upset, shouted "Goddammit," and smashed a wine bottle and wine glass before storming away. Tieman stayed with Tonita that evening to make sure things did not get out of hand, saying she thought "if it gets bad, I will call my husband or the police." Tieman did not see things get physical that evening.

{¶12} On cross-examination, Tieman testified that she had never discussed the February 22, 2019 incident with David and had not heard his version of the events. She admitted that she had never personally observed David strike Tonita. She nonetheless indicated that she believed David was abusive and that he caused the injuries to Tonita's face and head on February 22, 2019.

{¶13} Following Tieman's testimony, David testified in opposition to the issuance of a DVCPO. He testified that contrary to Tonita's assertions, he was not the abusive one in the marriage. Rather, David claimed that Tonita had gotten violent with him on a number of occasions after she consumed alcohol. He specifically denied that he ever choked Tonita, grabbed her arms in a jealous rage, or shoved her into a table or chair with such force that she damaged her ribs. David explained that Tonita bruised easily and that the injuries she sustained to her ribs in July 2018 were from a chair tipping her into a table while they were at a party where she had been drinking. As for the bruises observed on her arm in September 2018, David indicated that Tonita likely obtained the bruises while carrying moving boxes.

{¶14} David produced photographs of himself and Tonita on vacations and at various social functions in 2018, some of which were said to have been taken on the same date or shortly after the abusive incidents Tonita described during her testimony. In many of the photographs Tonita and David were smiling and embracing one another. These photographs did not show any bruises on Tonita's person.

{¶15} With respect to the February 22, 2019 incident with the water bottle, David indicated he played a trick on Tonita after the two returned home from a dinner where they had both been drinking. He stated that after he squeezed water into her eye, Tonita started complaining about her eye hurting. She grabbed the water bottle, dumped the remaining water over his head, and hit him in the face with her hand with enough force to knock his glasses off. Tonita then grabbed the empty water bottle and drove it into his face, causing some abrasions and bruises to his face. Photographs that David took of his face on the evening of February 22, 2019 were admitted into evidence.

{¶16} In order to protect and defend himself, David testified he pushed Tonita away from him. David explained that Tonita then slipped on the "real slick" floor, causing her to

fall and injure her head and face. David denies that Tonita lost consciousness and claims that she continued talking to him as she laid on the floor. David decided to leave the home and stay at a hotel for the evening. He explained that this was something he sometimes did after he and Tonita got into an argument, and he provided credit card statements showing multiple hotel expenditures from 2018 to 2019. David testified he returned to the marital home the following day after Tonita reached out to him and asked him to come home. Text messages Tonita sent four days after the incident, in which she stated she loved David, were admitted into evidence.

{¶17} David testified that on March 22, 2019, Cory and his girlfriend came to visit. According to David, Tonita drank quite a bit of wine at dinner and, as the night progressed, she accused Cory's girlfriend of stealing some of her shoes. David felt that the allegations were brought on by Tonita's excessive drinking and he did not believe that Cory's girlfriend had stolen from Tonita. An argument ensued between all of them and Tonita called Tieman over to the house for support. Ultimately Cory, Cory's girlfriend, and David decided to leave the house and stay at a hotel. According to David, after he left the marital home on March 22, 2019, he did not return except to pick up his belongings after the petition for a DVCPO had been filed against him. David further contended that though Tonita had filed for divorce after the March 22, 2019 incident, she had recently discussed reconciling with him.

{¶18} On cross-examination, David acknowledged that Tonita's injuries on February 22, 2019 were caused when she fell after he pushed her away from him. He denied that he forcibly threw her into the doorframe. He also denied that he intentionally caused her injuries on this date or any other date, claiming that any bruises or harm that he caused to Tonita occurred in the process of defending himself from her getting hit by her. He further explained that he did not call the police to report the abuse he suffered at Tonita's hands because he was embarrassed by the situation. He claims he did, however, tell his son and

his friend, Carl Gustafson, about the abuse.

{¶19} Gustafson testified he is a former neighbor of David and Tonita. In 2018, they all resided in the same apartment complex. Gustafson stated that he and his wife would get together with David and Tonita "once every couple of months or so" and that he observed David and Tonita get into verbal arguments. He never saw David physically harm or threaten to physically harm Tonita. Gustafson was not questioned about whether he had ever observed Tonita physically harm David.

{¶20} David's son Cory testified that since David's marriage to Tonita, David had not been as happy as he once was. Cory believed his father was upset about the amount of Tonita's drinking. Cory stated David called him the evening of February 22, 2019 and informed him that "they got into it after being out at a social event where Toni had knocked his glasses off his face * * * [and he was] beaten in the forehead by a water bottle." This was not the first time David had mentioned Tonita striking him. Cory stated his father told him that Tonita struck him in February 2018, after an argument at a restaurant. Cory never personally saw Tonita physically abuse his father; he only heard about the physical abuse from David.

{¶21} Cory testified he had observed a number of verbal altercations between David and Tonita. He provided details about the altercation he observed on March 22, 2019, wherein Tonita accused his girlfriend of stealing her shoes. Cory testified Tonita had been drinking that night and had "insisted on ordering multiple bottles of wine" at dinner. When Tonita accused Cory's girlfriend of stealing, a heated argument broke out among Tonita and David. Cory testified the argument did not turn physical and he, his girlfriend, and David ended up leaving the residence to stay at a hotel.

{¶22} David presented testimony from West Chester Police Officer Shawn McCreanor. Officer McCreanor testified that after David was served with the ex parte

protection order, David contacted the police department to request an escort to the marital home to collect some of his belongings. The officer decided it would be prudent to contact the petitioner of the protection order first and he went to the marital home to make contact with Tonita. When the officer knocked on the door, a woman looked out a window and asked the officer who he was and why he was there. The officer indicated he was there to talk with "Toni," but the woman stated "Toni" was not there. The officer left the home and went to talk with David, who pulled a photograph of Tonita up on his cell phone. David showed the photograph to the officer, and the officer identified the woman in the photograph as the same woman he had spoken to at the Porters' marital residence. The officer also identified Tonita in the courtroom as the individual whom he had spoken to at the Porters' home.

{¶23} Tonita testified on rebuttal that she does not have a drinking problem and is not an alcoholic. She denied that she was the aggressor on February 22, 2019, or that David was acting in self-defense when he threw her into the doorframe. She admitted that she threw the water bottle at him after he injured her by squeezing water into her eye, but otherwise denied making any other physical contact.

{¶24} With respect to the March 22, 2019 incident involving Cory, his girlfriend, and David, Tonita stated that all four of them had shared two bottles of wine at dinner. When she returned to her residence after Cory and his girlfriend had been at the home by themselves, she noticed items out of place and missing from her bedroom. When she confronted Cory's girlfriend about the missing items, an argument ensued. Cory and David became involved in the argument too. However, things did not escalate into a physical altercation between Tonita and David.

{¶25} Tonita further testified that she recalled Officer McCreanor coming to her door after she filed her petition for a DVCPO. She explained she did not answer the door

because he stated he was looking for "Toni." She explained, "[T]hat scared me because, if it was legal, they would have said Tonita. So that put my radar up right away. So I just didn't want to answer the door or talk to them. Every officer that's come to my house has called me by my legal name."

{¶26} After considering the foregoing testimony, the magistrate granted Tonita's petition for a DVCPO. The magistrate found by a preponderance of the evidence that David had attempted to cause or recklessly caused bodily injury to Tonita and he had placed Tonita, by the threat of force, in fear of imminent serious physical harm. In granting the petition, the magistrate noted that he did not find David "particularly credible." While he was "not fully convinced" that everything Tonita testified to was "fully credible" he nonetheless believed that there had been an altercation on the night of February 22, 2019 during which David had caused bodily injury to Tonita. The magistrate ordered that the protection order remain in full force and effect until April 2, 2020. The trial court adopted the magistrate's decision and David timely filed objections, arguing that the issuance of the DVCPO was against the manifest weight of the evidence. David contended Tonita was not a credible witness, that there was no evidence corroborating her version of events, and that it was an error to dismiss his claim of self-defense.

{¶27} Following a hearing, the trial court overruled David's objections, finding that "[a] review of the evidence and transcript reveal that [Tonita] showed by a preponderance of the evidence that [David] recklessly caused injury to [Tonita]." The court noted that while the magistrate had indicated that "both parties had credibility issues," Tonita had presented credible evidence from her neighbor about the February 22, 2019 incident. The court further noted that in rejecting David's self-defense claim and finding that he had recklessly caused injury to Tonita, the magistrate had been in the best position to observe the witnesses' demeanor and evaluate their credibility and believability.

{¶28} David appealed, raising three assignments of error. For ease of discussion, we will address David's first and second assignments of error together.

{¶29} Assignment of Error No. 1:

{¶30} THE TRIAL COURT ERRED BY RELYING UPON ALLEGED PAST ACTS TO ESTABLISH THAT AN ACT OF DOMESTIC VIOLENCE OCCURRED.

{¶31} Assignment of Error No. 2:

{¶32} THE TRIAL COURT ERRED BY RELYING UPON APPELLEE'S TESTIMONY AFTER HER CREDIBILITY WAS CALLED INTO QUESTION AND WHICH TESTIMONY WAS WHOLLY UNSUBSTANTIATED BY ANY CORROBORATING EVIDENCE.

{¶33} In his first assignment of error, David argues the trial court erred in granting the DVCPO when "the most recent alleged incident [Tonita] complained of occurred on February 22, 2019, more than one month prior to filing her petition." David contends the court relied on "past acts" and did not determine that Tonita was in immediate and present danger of domestic violence. In his second assignment of error, David argues Tonita failed to present credible testimony in support of her petition for a DVCPO and contends that corroborating evidence was necessary to support the issuance of the DVCPO.

{¶34} A petition for a DVCPO is governed by R.C. 3113.31. *Crawford v. Brandon*, 12th Dist. Butler Nos. CA2013-08-150 and CA2013-08-151, 2014-Ohio-3659, ¶ 6. Pursuant to that statute, to obtain a DVCPO the petitioner must prove by a preponderance of the evidence that the respondent has engaged in an act of domestic violence against the petitioner or petitioner's family or household members. *McBride v. McBride*, 12th Dist. Butler No. CA2011-03-061, 2012-Ohio-2146, ¶ 12, citing *Felton v. Felton*, 79 Ohio St.3d 34 (1997), paragraph two of the syllabus. "'Preponderance of the evidence' means the greater weight of the evidence, or evidence that leads the trier of fact to find that the existence of

the contested fact is more probable than its nonexistence." *McGrady v. Muench*, 12th Dist. Warren No. CA2018-12-145, 2019-Ohio-2677, ¶ 12.

{¶35} For the purpose of this case, domestic violence means "[a]ttempting to cause or recklessly causing bodily injury" to a "family or household member." R.C. 3113.31(A)(1)(a)(i).[2] A spouse constitutes a "family or household member." R.C. 3113.31(A)(3)(a)(i). "[W]hile R.C. 3113.31 does not define the term 'bodily injury,' for purposes of the offense of domestic violence under R.C. 2901.01(A)(3), 'physical harm' to a person means 'any injury, regardless of its gravity or duration.'" *McGrady* at ¶ 13, quoting *J.R. v. E.H.*, 10th Dist. Franklin No. 16AP-431 2017-Ohio-516, ¶ 13.

{¶36} "A trial court's decision to grant or deny a DVCPO will not be reversed where such decision is supported by the manifest weight of the evidence." *Barrett v. Barrett*, 12th Dist. Warren No. CA2016-04-033, 2017-Ohio-250, ¶ 19. The standard of review for a manifest weight challenge in a civil case is the same as that applied to a criminal case. *Dunn v. Clark*, 12th Dist. Warren No. CA2015-06-055, 2016-Ohio-641, ¶ 8, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 17. In considering a manifest weight challenge, a reviewing court weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created a manifest miscarriage of justice warranting reversal and a new trial ordered. *Hacker v. House*, 12th Dist. Butler No. CA2014-11-230, 2015-Ohio-4741, ¶ 21, citing *Eastley* at ¶ 20. "A judgment will not be reversed as being against the manifest weight of the evidence where the judgment is supported by some

---

2. In granting the DVCPO, the magistrate and trial court specifically found that "Respondent committed acts or engaged in behaviors directed toward a family or household member in violation of R.C. 3113.31(A)(1): (a) Attempting to cause or recklessly cause bodily injury; [and] (b) Placing another person by the threat of force in fear of imminent serious physical harm or committing a violation of section 2903.211 (menacing by stalking) or 2911.211 (aggravated trespass) of the Revised Code." However, in ruling on David's objections to the magistrate's decision, the trial court limited its analysis to its finding that David recklessly caused bodily injury to Tonita. We will likewise limit our analysis to this finding.

competent, credible evidence going to all essential elements of the case." *McGrady* at ¶ 14.

{¶37} Having reviewed the record, we find that the trial court's decision to issue the DVCPO was not against the manifest weight of the evidence. Tonita presented competent, credible evidence that David engaged in an act of domestic violence on February 22, 2019 when he shoved her into the doorframe, causing injury to her head and face. Both Tonita and Tieman testified about the injuries Tonita sustained and photographs of those injuries were admitted into evidence.

{¶38} David did not dispute that he caused Tonita injury when he shoved her and caused her to fall. Instead, he presented a conflicting account of the incident, wherein Tonita was the aggressor and he acted in self-defense. David argues the trial court erred by crediting Tonita's testimony over his testimony and the testimony of his supporting witnesses, especially as the magistrate noted that not everything Tonita testified to was fully credible. However, "it is well-established that a trial court, particularly a domestic relations court, is in the best position to assess the credibility of witnesses and the weight to be given to their testimony." *McGrady,* 2019-Ohio-2677 at ¶ 15, citing *Halcomb v. Greenwood,* 12th Dist. Clermont Nos. CA2018-03-008, CA2018-03-010, CA2018-03-012, and CA2018-0-013, 2019-Ohio-194, ¶ 40. Furthermore, in accessing each witness' credibility, the "trier of fact is free to believe all, part, or none of the testimony of each witness." *Bartells v. Bertel,* 12th Dist. Butler No. CA2016-11-216, 2018-Ohio-21, ¶ 63. As the domestic relations court was best suited to assess the credibility and the weight given to the witnesses' testimony, this court will not substitute our judgment for that of the trial court. *McGrady* at ¶ 15; *Crawford,* 2014-Ohio-3659 at ¶ 15. The court was entitled to rely on Tonita's testimony about the events that occurred on February 22, 2019 and to discredit David's claim that he acted in self-defense.

- 13 -

{¶39} Additionally, to the extent that David argues the trial court erred in granting the DVCPO since the only evidence indicating he recklessly caused Tonita injury was her own testimony, we find no merit to his argument. "The Ohio Supreme Court * * * has expressly rejected the contention that corroborating eyewitness testimony or medical evidence must be presented to establish domestic violence by a preponderance of the evidence." *Crawford* at ¶ 17, citing *Felton*, 79 Ohio St.3d at 44-45. Based on the supreme court's holding in *Felton*, Tonita's testimony, standing alone, was sufficient to meet the preponderance of the evidence standard necessary to obtain a DVCPO without any additional evidence corroborating her testimony. *See, Halcomb* at ¶ 39-40; *Weismuller v. Polston*, 12th Dist. Brown No. CA2011-06-014, 2012-Ohio-1476, ¶ 23. However, in this case, contrary to David's assertions, there was additional evidence supporting Tonita's version of events. Tonita presented photographs of her injuries and testimony from Tieman. Tieman testified as to Tonita's excited utterances immediately after the February 22, 2019 incident and her observations of Tonita's injuries.

{¶40} David also argues that it was error for the trial court to issue the DVCPO since the domestic violence incident occurred on February 22, 2019 and Tonita waited until March 26, 2019 to file her petition. He contends that because Tonita continued to live with him after the incident and waited over a month to file her petition for a protection order, she could not show an immediate and present danger of domestic violence. We find no merit to David's arguments. Tonita's testimony indicated that her marriage to David had been fraught with abuse – both mental and physical abuse. While Tonita's testimony about past acts of domestic violence occurring between June 2018 and November 2018 was insufficient, on its own, for the trial court to grant a civil protection order – *see Partin v. Morrison*, 12th Dist. Brown CA2015-01-003, 2015-Ohio-4740, ¶ 11 – those acts were relevant to explain Tonita's state of mind and her delay in filing the petition for a DVCPO.

- 14 -

{¶41} Tonita testified that the numerous incidents of abuse that occurred during her marriage kept her from filing a police report or immediately filing for a DVCPO after the February 22, 2019 incident. Tonita explained she "was always scared" of David and it took her some time to gather her courage to file the petition. Tieman's testimony corroborated this fear. Tieman explained that though she called the police to report Tonita's injuries and the domestic violence incident on February 22, 2019, Tonita begged her not to report David because Tonita was "so afraid of what would happen." Tonita's fear caused her to leave Tieman's home before the officer could arrive to make a report and the fear Tonita expressed convinced Tieman not to disclose Tonita's or David's names to the officer.

{¶42} The month that passed between the February 22, 2019 incident and Tonita filing her petition for a DVCPO did not diminish Tonita's fear or the danger of domestic violence. At the final hearing Tonita testified that she remained in fear of David. She further testified that if the DVCPO were not granted, she feared David would again engage in the violent acts which caused her to fear for her life.

{¶43} Accordingly, given the testimony and evidence presented at the hearing, we conclude that Tonita met her burden under R.C. 3113.31 of demonstrating by a preponderance of the evidence that she was in danger of domestic violence by David. The issuance of the DVCPO was not against the manifest weight of the evidence. David's first and second assignments of error are overruled.

{¶44} Assignment of Error No. 3:

{¶45} THE TRIAL-COURT ERRED BY DISMISSING APPELLANT'S CLAIM OF SELF-DEFENSE AGAINST APPELLEE.

{¶46} In his final assignment of error, David argues the trial court "is obligated to consider a self-defense claim to an allegation of domestic violence" and that Tonita was "obligated to prove that [he] did not use his actions in self-defense and prove it beyond a

reasonable doubt." In support of his argument David cites to a criminal statute, R.C. 2901.05(B)(1).

{¶47} As an initial matter, we note that the trial court did consider David's self-defense argument. In ruling on David's objections to the magistrate's decision, the trial court specifically noted that "Mr. Porter presented testimony from his son, a neighbor, and a police officer in support of his position that domestic violence either did not occur, *or was in self-defense*." (Emphasis added.) The court noted that the magistrate assessed the credibility of David's testimony and evidence and did not find it, or his claim of self-defense, very credible. Likewise, the trial court, after performing an independent review of the transcript and evidence, did not find David's claim of self-defense credible. As the trier of fact "ha[d] the best opportunity to view the demeanor, attitude, and credibility of each witness * * * this court will not second-guess its judgment." *Gillespie v. Gillespie*, 12th Dist. Clermont No. CA2011-05-034, 2012-Ohio-51, ¶ 13, citing *Tomes v. Tomes*, 12th Dist. Butler No. CA2003-10-264, 2005-Ohio-1619, ¶ 10.

{¶48} Additionally, contrary to appellant's assertions, R.C. 2901.05(B)(1) is not applicable to the proceedings for a DVCPO issued under R.C. 3113.31. R.C. 2901.05 places the burden on the prosecution in a criminal trial to show beyond a reasonable doubt that an accused person did not use force in self-defense. The statute does not have any bearing on proceedings for a DVCPO as such proceedings are civil in nature and are not akin to a criminal prosecution.

{¶49} Self-defense is an affirmative defense, which meant David, as the respondent, had the burden of establishing he caused or attempted to cause bodily injury to appellant only in defense of his person. *See J.R.*, 2017-Ohio-516 at ¶ 21. David's testimony that he shoved Tonita into a doorframe, causing injuries to face and head, only in self-defense was an issue considered and rejected by both the magistrate and trial court. Given the record

before us, we conclude that the trial court did not err in rejecting David's claim of self-defense and granting a DVCPO in favor of Tonita. David's third assignment of error is overruled.

{¶50} Judgment affirmed.

S. POWELL, J., concurs.

PIPER, J., dissents.

**PIPER, J., dissenting.**

{¶51} Respectfully, contrary, to the majority's opinion, the record here demonstrates there was neither competent, nor credible, evidence which existed to support the manifest weight of the evidence. Thus, the decision to grant the DVCPO was in error, and I respectfully dissent from the majority's willingness to affirm that decision.

{¶52} Tonita did not contest David's factual assertions, nor his arguments relative to the issues on appeal.[3] David asserted that the timing of Tonita's allegations were related to gaining a tactical advantage in the pending divorce proceedings. In the DVCPO proceedings, the record concluded with the trial court indicating if the pending divorce proceedings were resolved by the parties, they could also resolve the DVCPO upon re-approaching the court. It appears there is merit to David's argument that the two proceedings were not unrelated.

{¶53} Not only was the substance of the testimony incompetent due to the frequent and excessive intoxicated state of both parties at the time of the events, but also the testimony was further diluted by multiple episodes of opinion testimony from others who

---

3. App.R. 18(C) determines that when a party "fails to file a brief addressing the facts and issues, the court may accept appellant's statement of facts and issues as correct and reverse the judgment * * *." *Gerdes v. Gerdes*, 12th Dist. Butler No. CA2019-07-106, 2020-Ohio-3405, fn 1.

had not witnessed the events. While the testimony was drastically different between Tonita and David, the court found *both parties* to have credibility issues. Both alleged ill motive to the other and both acknowledged that on the night in question, as with other past events, there was excessive use of alcohol. It is common knowledge excessive alcohol consumption impairs judgment, physical coordination, perception, and among other things, the ability to recount and report events accurately.

{¶54} Additionally, Tonita even admitted lying to a police officer; to her, deceiving an investigating officer appears easily justifiable. Tonita's justification for lying about her identity to the police officer who wanted to talk to her, was because police officers who had approached her on other occasions had called her by her "legal" name, and this particular police officer called her by the name she goes by; no reasonable person would consider this a good reason to lie to an officer of the law. Despite the parties continuing to live together after the event in question, Tonita did not raise the event to authorities until seeking to gain sole possession of their residence over thirty days later. Unrefuted are David's allegations that both before and after filing her petition, Tonita was seeking reconciliation.

{¶55} While the trial court never gave an analysis to David's self-defense claim, the trial court appears to have been dissuaded by David's claim of self-defense *solely* because he is physically larger than Tonita. However, it is not reasonable to presume the larger person is always the aggressor, particularly when alcohol is in play. It is also common knowledge that any size person can be the instigator when fueled with liquid courage. Pent up frustrations, resentments, and exaggerated emotions can be unleashed by alcohol. The undisputed facts reveal what raised Tonita's ire was David playing a, maybe not so funny, practical joke on her.

{¶56} Yet, without a factual analysis, and as we have previously stated, "this court cannot perform a meaningful appellate review of the domestic relations court's decision

absent clear * * * reasoning and analysis." *Gerdes v. Gerdes*, 12th Dist. Butler No. CA2019-07-106, 2020-Ohio-3405, ¶ 20. David's credibility cannot be assessed merely by his size difference, which is the only fact referenced by the trial court.

{¶57} With their relationship containing jealousy and the repetitive over-indulgence in alcohol consumption, the relationship appears doomed to fail. The common thread of truthfulness coming from David's and Tonita's testimony reveals a tumultuous roller coaster ride of partying, spats, and reunifications. The quarrelling, misunderstandings, and heated confrontations the two mutually participated in were destined to result in divorce.[4]

{¶58} It remains clear from the different versions of what took place that the truth will remain obscure and unattainable. Despite the quantity of evidence both parties offered to support their contentions, the *quality* of evidence necessary to be considered competent and credible is vastly lacking. Therefore, when considering Tonita did not contest David's facts and issues as stated on appeal, and considering the manifest weight of the evidence must be supported by competent, credible evidence, we are restrained in the necessity to apply appellate review standards and I would reverse the decision granting a DVCPO against David (a CPO can always be refiled should the need arise). Therefore, I respectfully dissent from the opinion of my colleagues in affirming the trial court's decision and would vacate the DVCPO.

---

4. In this matter, a final decree was filed June 18, 2020 officially ending the marriage between Tonita and David. We may take judicial notice of proceedings involving the parties, which are readily accessible from the Clerk of Courts internet website. *In re Helfrich*, 5th Dist. Licking No. 13CA20, 2014-Ohio-1933, ¶ 35.