[Cite as *Gherman v. Culberson*, 2025-Ohio-4513.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLINTON COUNTY


| | | |
|---|---|---|
| ERIC GHERMAN, et al., | : | |
| Appellants, | : | CASE NOS. CA2025-01-001 |
| | | CA2025-01-002 |
| | : | CA2025-01-003 |
| - vs - | | CA2025-01-004 |
| | : | |
| | | OPINION AND |
| MEGAN CULBERSON, et al., | : | JUDGMENT ENTRY |
| | | 9/29/2025 |
| Appellees. | : | |


CIVIL APPEAL FROM CLINTON COUNTY COURT OF COMMON PLEAS
Case Nos. DRH 20240128, DRH 20240142, DR 20240129, DRH 20240131


Thomas G. Eagle Co., L.P.A., and Thomas G. Eagle, for appellants.

Brian E. Lusardi, for appellees.


## **O P I N I O N**


**HENDRICKSON, P.J.**

{¶ 1} Appellants, Eric Gherman and Meghan Carpenter (collectively, "Appellants"), appeal the trial court's adoption of a magistrate's decision granting civil

stalking protection orders ("CSPOs") in favor of appellees, Megan Culberson and Terri Culberson (collectively, "Appellees"), and denying Gherman's petition for a CSPO against Terri.

**Factual Background**

{¶ 2} Appellants and Appellees are neighbors who live near one another on North South Street in Wilmington, Ohio. The parties' homes are approximately 60 to 90 feet apart and are set on the same side of the street with a house in between. Megan and her husband live at 879 North South Street with their three children, who were six, seven, and eight years old at the time of the hearing. Megan's mother-in-law, Terri, and father-in-law also live in the home. Gherman and Carpenter live at 901 North South Street with Gherman's young daughter.

{¶ 3} Appellants and Appellees have a contentious history, with negative encounters dating back to 2018. On April 17, 2024 Megan filed petitions for CSPOs against Appellants. In her petitions, Megan described several occasions between April and May 2024 where Appellants made threatening statements to, and engaged in aggressive behavior towards, Megan and her children. That same day, April 17, 2024, Terri filed a petition for a CSPO against Carpenter. To support her petition, Terri stated that Carpenter made threatening comments to "take us all out," and that Carpenter had taken photographs of Terri and threatened her on other occasions.

{¶ 4} On April 23, 2024 Gherman filed a petition for a protection order against Terri. To support his petition, Gherman described an encounter between he and Terri on April 16, 2024 where Terri made threatening and harassing statements toward him and Carpenter. Gherman also stated Terri took inappropriate photographs of Carpenter and

her daughter and caused Gherman to have a heart attack on April 17, 2024. Gherman stated he is in fear for his life and is seeking "mental help" to deal with what Terri caused on April 17, 2024. Gherman also attached a copy of a protection order petition he filed against Terri in November 2023, which cites to incidents between Gherman and Terri from October 2023.[1]

{¶ 5}   The matter proceeded to a full hearing on July 17, 2024. In preparation for the hearing, the trial court issued a scheduling order which set forth deadlines for the disclosure of witnesses and the exchange of exhibits. By the time of the full hearing before the magistrate, neither party had exchanged or produced any exhibits nor had they disclosed any witnesses. As a result, the magistrate limited the evidence to the testimony provided by Appellants and Appellees.

{¶ 6}   At the hearing, the magistrate heard testimony concerning the four CSPO petitions before the court. As part of her testimony, Megan detailed several encounters with Appellants that led her to request CSPOs against them. The first incident occurred on March 25, 2024, when Megan and her children were in the yard of their home. After a few hours, Gherman began yelling and cursing at the children from his back porch and threw rocks toward the children. Gherman continued cursing at the children until Megan took them inside for their safety. Megan testified this encounter was "nothing new" or "out of the ordinary," as Appellants frequently curse at her children; threaten to have them arrested; and call them names.

{¶ 7}   Megan next described an incident from April 12, 2024, where her children

---

1. Gherman also filed a petition for a civil stalking protection order against Joseph Culberson, however, that petition was dismissed by the magistrate at the beginning of the final hearing.

were riding their bicycles on the sidewalk in front of Gherman's home. At some point, Appellants noticed the children, which led to Gherman calling the youngest child a "cuss word" before threatening to have her arrested for touching his property and trespassing. Carpenter also threatened that she "was going to take [the child] out" if the child did not "stay away," which Megan understood as a threat to cause physical harm to the child.

{¶ 8}   The next incident occurred on April 16, 2024, when the children were playing in their backyard with Megan. Appellants began yelling "[v]ery graphic nasty words" at the children, "things that you should never say to minor children at all[,]" including calling the children "[a] fucking bitch, trash, nasty, stupid whores, [and] stupid bitches." Megan also heard Carpenter threaten to cause physical harm to her children during the incident.

{¶ 9}   In addition to the above, Megan stated there were other occasions where Appellants recorded her children and yelled at them, as well as one incident where Carpenter nearly struck one of the children with her vehicle. According to Megan, Appellants constantly record Megan and her family members with their cell phones. Megan testified she informed law enforcement of Appellants' actions, but nothing could be done. Megan stated that Gherman is "not in the right mind," and Carpenter is "crazy, psychotic, aggressive, and suicidal." To avoid interactions with Appellants, Megan has altered her family routine to make her children feel safe, including obtaining additional childcare and limiting their time outside. Due to Appellants' behavior, Megan is afraid for her safety, as well as the safety of her children.

{¶ 10}  As part of his testimony, Gherman denied engaging in the behavior described by Megan. Gherman testified that he was not home on April 12 or April 16,

2024, at the time of the alleged encounters, and that he was too ill to engage in the March 25, 2024, behavior described by Megan. According to Gherman, he could not throw pavers from his yard to Megan's due to his health condition.

{¶ 11} Regarding his petition against Terri, Gherman testified that on April 11, 2024 Terri intentionally hit Carpenter in the face with rocks while mowing his neighbor's lawn. Then, on April 16, 2024, Terri took "sexually devious" photographs of Carpenter getting out of her vehicle. That same day, Terri threatened to "do stuff" to Gherman, told him that "his day's coming" and that "he's going to get what's coming to him," "I'm going to make sure it happens."

{¶ 12} Gherman next testified regarding an incident that occurred on April 17, 2024. That day, Gherman went to the Alternatives to Violence office to obtain protection orders against Appellees. Upon arriving, Gherman noticed Terri was blocking his entrance to the building, which Gherman believed was to prevent his filing for a protection order. Shortly thereafter, Gherman went into cardiac arrest and was transported to the hospital. Gherman described Terri's actions that day as "attempted murder," and attributed his cardiac arrest to Terri's behavior.

{¶ 13} Regarding the incident at the Alternatives to Violence office, Terri stated she was at the office that day with her husband and Megan to file for protection orders against Carpenter. Terri denied making any verbal or physical threats to harm Gherman and explained it was a coincidence that they were at the office at the same time.

{¶ 14} In addition to the above, Gherman further testified that Terri engages in numerous troublesome behaviors, including listening to his conversations, driving by his house constantly, watching Appellants in their backyard, threatening to shoot Gherman,

hiring a private investigator to follow him, and attempting to murder him by stressing him out to the point of cardiac arrest. Gherman did not provide dates for many of the above incidents but acknowledged that some of them were included in his November 2023 CSPO petition against Terri, which was denied. Terri denied she engaged in any of the above behaviors, and testified her family actively works to protect themselves from Appellants false allegations against her family.

{¶ 15} Like Gherman, Carpenter also denied being home on many of the dates at issue and disputed that she instigated any of the encounters described by Terri or Megan. On cross-examination, Carpenter acknowledged that she was home on March 25 and April 16 and stated she misspoke previously due to confusion from her health conditions.

{¶ 16} Throughout Appellants' testimonies, there were repeated references to their significant health problems, including their frequent black outs, Gherman's heart condition, and Carpenter's PTSD. According to Carpenter, Gherman passes out at least once or twice a day after seeing Terri either in person or driving by his home. Carpenter attributes Gherman's black outs to the stress Terri causes Gherman. Carpenter testified that she also has recurrent blackouts, during which she becomes disoriented and cannot recall what she did or said.

{¶ 17} Regarding her CSPO petition against Carpenter, Terri testified that on April 16, 2024, Terri was in her front yard with Megan and the children when Carpenter "threatened to take all of us out." Carpenter then began yelling and screaming at Terri and her family unprovoked. Terri stated that Carpenter has made threatening statements to her and her family members and described Carpenter as violent and belligerent. Terri believes Carpenter is capable of harming her or a family member, and recently, Carpenter

attempted to hit the children with her car. Terri testified that Carpenter took photographs of Terri while she mowed her neighbor's lawn, stalks Terri in her yard, and throws pavers and rocks at the children. Terri also indicated that, not only do Appellants harass her, but they often involve the police department. Terri indicated her interactions with Carpenter cause her stress, which triggers her neuromuscular disorder and shuts down her body. As a result, Terri has begun counseling. In light of Carpenter's behavior, Terri does not feel safe.

{¶ 18} After considering the evidence presented at the hearing, the magistrate issued decisions denying Gherman's petition for a CSPO against Terri; granting Megan's petitions for CSPOs against Appellants; and granting Terri's petition for a CSPO against Carpenter. On August 6, 2024, the trial court adopted the decision of the magistrate.

{¶ 19} Thereafter, Appellants obtained counsel and filed objections to the magistrate's decision. In their objections Appellants argued the magistrate improperly excluded Appellants' evidence at the final hearing; improperly granted the CSPOs in favor of Appellees; and improperly imposed terms that are "unjustified and an extreme hardship" on Appellants. Due to these issues, Appellants asked the trial court to reverse the issuance of the CSPOs or, in the alternative, to modify their terms.

{¶ 20} On August 28, 2024, the trial court issued an entry modifying the terms of the CSPOs. In so doing, the trial court added language indicating that nothing in the CSPOs precluded Gherman from being at his daughter's school or attending her school activities. Nor did the terms of the CSPOs prohibit Appellants from residing in their residence.

{¶ 21} The trial court held a hearing regarding Appellants' objections and issued a

decision and entry for each of the petitions. Regarding the protection orders awarded against Carpenter, the trial court overruled Carpenter's objections in their entirety. Regarding Gherman, the trial court incorporated the language from its August 28, 2024 entry into the CSPOs granted to Appellees, and reiterated that the CSPOs do not impact Gherman's presence at his daughter's school or events, or to live in his home. In all other respects, the trial court overruled Appellants' objections and issued the CSPOs as modified.

**The Appeal**

{¶ 22} Appellants now appeal, raising four assignments of error for this court's review.

{¶ 23} Assignment of Error No. 1:

{¶ 24} THE TRIAL COURT ERRED IN IMPOSING THE SANCTION OF EXCLUSION OF EVIDENCE AT TRIAL FOR A PRETRIAL DISCOVERY AND DISCLOSURE OMISSION.

{¶ 25} Appellants contend the trial court abused its discretion when it excluded certain evidence they attempted to introduce at the hearing. Specifically, Appellants claim that, by limiting their evidence to the parties' testimonies, they could not fully present their defense and were highly prejudiced.

{¶ 26} Civ.R. 37 authorizes the court to make "just" orders in response to violations of the discovery rules or court orders. *Mundy v. Centrome, Inc.*, 2023-Ohio-1321, ¶ 32 (12th Dist.). A court may sanction a party for failing to comply with a discovery order by excluding evidence. *State ex rel. DeWine v. ARCO Recycling, Inc.*, 2022-Ohio-1758, ¶ 54 (8th Dist.). A court's determination to impose a discovery sanction will not be reversed on

appeal unless the trial court abused its discretion. *Vaughn v. Vaughn*, 2022-Ohio-1805, ¶ 32 (12th Dist.). An abuse of discretion implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Lykins v. Hale*, 2023-Ohio-752, ¶ 18 (12th Dist.).

{¶ 27} In this case, the trial court issued a scheduling order on May 3, 2024. That order set a series of discovery deadlines, including deadlines for the proper disclosure of witnesses, the proper exchange of exhibits, and the proper disclosure of electronic evidence. According to the scheduling order, all evidence intended to be presented at the final hearing was to be disclosed or exchanged to the opposing party or counsel at least seven days prior to the final hearing. The scheduling order states, in multiple places, that evidence not properly disclosed or exchanged would not be admissible at the final hearing. This includes a statement near the end of the scheduling order, in bold and all capital letters, that

> [f]ailure to abide by the provisions of this scheduling order may result in the denial of admission of exhibits and/or presentation of evidence and witness testimony.

{¶ 28} Despite receiving copies of the scheduling order, neither party exchanged any evidence; identified any witnesses; or produced any electronic evidence prior to the full hearing. At the outset of the hearing, the magistrate noted that any discovery that had not been exchanged between the parties, including any documents or electronic evidence, would not be admissible. Notwithstanding this statement, Appellants attempted to produce evidence throughout the hearing that had not been previously identified or shared with Appellees, their counsel, or the court. This evidence included additional witnesses and video recordings from two flash drives and Carpenter's cell phone. After objection from Appellees, the magistrate did not allow Gherman to present testimony from

- 9 -

the undisclosed witnesses. The magistrate also did not view Appellants' electronic evidence, however, this was due, in part, to Appellants' inability to use the court's technology and Carpenter's decision not to place her cell phone into evidence. According to Gherman, the video recordings would have shown Terri mowing her neighbor's lawn and blowing the grass, dust, and rocks toward his vehicle and Carpenter, as well as Terri following Gherman out of their neighborhood.[2]

{¶ 29} On appeal, Appellants argue that, despite their noncompliance with the court's scheduling order, the trial court should not have excluded their additional evidence. According to Appellants, the exclusion of evidence is the harshest penalty available, and the trial court could have allowed the presentation of the evidence or imposed an alternate remedy without any prejudice to the opposing parties. As such, Appellants claim the trial court's decision to exclude the evidence, without first considering any alternate, less severe, remedies was an abuse of discretion.

{¶ 30} After a thorough review of the record, we find no merit to Appellants' claims. As this court has recognized, "[t]rial courts have broad discretion in managing their dockets, setting case schedules and imposing discovery sanctions for violations of court rules and scheduling orders." *Auto Recyclers of Middletown, Inc. v. Stein, L.L.C.*, 2025-Ohio-414, ¶ 15 (12th Dist.). Pursuant to Civ.R. 37(B)(2)(b), a court may preclude a party from introducing designated matters in evidence if that party "fails to obey an order to provide or permit discovery[.]" *Bailey v. Bailey*, 2004-Ohio-6930, ¶ 31 (12th Dist.). This is true even "when the failure to comply with the discovery rules results merely from neglect,

---

2. The magistrate noted that the video of Terri following Gherman was not relevant to the instant petition and instead concerned an incident the court had previously addressed.

a change in trial strategy, or inadvertent error." *Homme v. Homme*, 2010-Ohio-6080, ¶ 50 (12th Dist.).

{¶ 31} While excluding evidence can be a harsh discovery sanction, under the facts of this case, we cannot say the trial court abused its discretion in excluding the undisclosed evidence of Appellants. Pursuant to the scheduling order, which Appellants acknowledge they received, they were aware of their responsibility to exchange and disclose the evidence they intended to produce at the final hearing. Appellants attribute their error to the fact that they did not have counsel's contact information and therefore, could not exchange the information. Notwithstanding Appellants' assertion, multiple filings within the trial court identify Appellees' counsel and provide his contact information. Even if such information was not readily available to Appellants, the scheduling order states the evidence could be exchanged with, and disclosed to, Appellees directly. Given the proximity of Appellees' and Appellants' homes, as well as the frequent encounters between the parties, it is evident Appellants could have provided their evidence to Appellees at some point before the hearing. This is especially true given Gherman's indication on the record that his flash drive of electronic evidence was prepared in advance of the hearing.

{¶ 32} We are likewise unpersuaded that the trial court should have excused Appellants' noncompliance with the scheduling order because Appellees' counsel did not provide any evidence to Appellants. Because Appellees' counsel intended to present only testimony from Appellees to support his case, he was under no obligation to disclose or exchange additional evidence with Appellants. Appellants, on the other hand, sought to present additional witnesses, as well as electronic evidence, to support their claims. As

- 11 -

such, and in accordance with the court order, they were required to share such evidence with Appellees beforehand. We note that, upon learning their undisclosed evidence would not be considered, Appellants did not request a continuance of the hearing and elected to proceed knowing their evidence would be limited. Although Appellants represented themselves pro se at the final hearing, the Supreme Court of Ohio has repeatedly found that pro se litigants are presumed to have knowledge of the law and must follow the same procedures as litigants represented by counsel. *State ex rel. Gessner v. Vore*, 2009-Ohio-4150, ¶ 5; *State ex rel. Fuller v. Mengel*, 2003-Ohio-6448, ¶ 10. Thus, Appellants' failure to adhere to the deadlines set forth in the court's scheduling order cannot be excused for lack of counsel or knowledge of the law.

{¶ 33} The purpose of the discovery rules is to prevent surprise and the secreting of evidence favorable to one party. *Noble v. Atomic Auto Sales, Inc.*, 2008-Ohio-233, ¶ 20 (8th Dist.). The exclusion of reliable and probative evidence is an extreme sanction but is appropriate when "necessary to enforce willful noncompliance or to prevent unfair surprise." *Nead v. Brown Cty. Gen. Hosp.*, 2007-Ohio-2443, ¶ 17 (12th Dist.). In this case, the parties were warned by the magistrate that failure to exchange exhibits or disclose witnesses could result in exclusion of that evidence from the hearing. It is clear that the magistrate, and the trial court by adopting the magistrate's decision, found the undisclosed electronic evidence and additional witness testimony inadmissible given Appellants' failure to comply with the court order. The court was within its discretion to regulate its proceedings in this manner. *See Hosler v. Hosler*, 2016-Ohio-5777, ¶ 74-75 (12th Dist.).

{¶ 34} Appellants' first assignment of error is overruled.

{¶ 35} Assignment of Error No. 2:

{¶ 36} THE TRIAL COURT ERRED IN GRANTING THE APPELLEES' PROTECTION ORDER.

{¶ 37} Assignment of Error No. 3:

{¶ 38} THE TRIAL COURT ERRED IN DENYING THE APPELLANT'S PROTECTION ORDER.

{¶ 39} In their second and third assignments of error, Appellants argue the trial court erred in granting CSPOs against them and denying Gherman's CSPO petition against Terri. In so doing, Appellants contend the excluded evidence discussed above would have refuted Appellees' claims and supported Gherman's claims against them. Appellants also argue there was insufficient credible evidence to support the granting of the CSPOs against them.

## Rule of Law and Standard of Review

{¶ 40} "R.C. 2903.214 governs both civil stalking and sexually oriented offense protection orders." *Tucker v. Uhl*, 2023-Ohio-3680, ¶ 15 (12th Dist.). "The trial court must find that the elements of R.C. 2903.214(C)(1) were proven by a preponderance of the evidence in order to grant the petitioner a civil stalking protection order." *Mather v. Hilfinger*, 2021-Ohio-2812, ¶ 16 (12th Dist.). "Preponderance of the evidence" means the greater weight of the evidence, or evidence that leads the trier of fact to find that the existence of the contested fact is more probable than its nonexistence. *McGrady v. Muench*, 2019-Ohio-2677, ¶ 12 (12th Dist.). Therefore, "[w]hen assessing whether a civil stalking protection order should have been issued, the reviewing court must determine whether there was sufficient credible evidence to prove by a preponderance of the

- 13 -

evidence that the petitioner was entitled to relief." *Fouch v. Pennington*, 2012-Ohio-3536, ¶ 9 (12th Dist.). This standard is, in essence, a review as to whether the issuance of the civil stalking protection order was against the manifest weight of the evidence. *McBride v. McBride*, 2012-Ohio-2146, ¶ 10 (12th Dist.).

{¶ 41} "The standard of review for a manifest weight challenge in a civil case is the same as that applied to a criminal case." *Dunn v. Clark*, 2016-Ohio-641, ¶ 8 (12th Dist.), citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 17. A challenge to the manifest weight of the evidence requires this court to examine whether there exists a greater amount of credible evidence to support one side of the issue rather than the other. *Martinez v. Martinez*, 2023-Ohio-4783, ¶ 15 (12th Dist.). Therefore, when considering a manifest weight challenge, this court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created a manifest miscarriage of justice warranting reversal and a new trial ordered." *Hacker v. House*, 2015-Ohio-4741, ¶ 21 (12th Dist.) citing *Eastley* at ¶ 20.

{¶ 42} However, while this court must weigh the evidence and consider the credibility of the witnesses, it is well established that a determination regarding the witnesses' credibility is primarily for the trier of fact to decide. *See State v. Lewis*, 2020-Ohio-3762, ¶ 19 (12th Dist.). To that end, because it is primarily the trier of fact who decides the witnesses' credibility, "[a] judgment will not be reversed as being against the manifest weight of the evidence where the judgment is supported by some competent, credible evidence going to all essential elements of the case." *Halcomb v. Greenwood*, 2019-Ohio-194, ¶ 36 (12th Dist.). Accordingly, "reversing a judgment on manifest weight

grounds should only be done in exceptional circumstances, when the evidence weighs heavily against the judgment." *Jones v. Wall*, 2016-Ohio-2780, ¶ 14 (12th Dist.).

{¶ 43} Pursuant to R.C. 2903.214(C)(1), the issuance of a civil stalking protection order "requires the petitioner to establish that the respondent engaged in conduct constituting menacing by stalking." *Harnar v. Becker*, 2021-Ohio-784, ¶ 6 (12th Dist.). R.C. 2903.211(A)(1) defines "menacing by stalking" to mean engaging in a "pattern of conduct" that "knowingly" causes "another person to believe that the offender will cause physical harm to the other person" or "mental distress to the other person." More specifically, R.C. 2903.211(A)(1) states:

> No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family or household member of the other person.

{¶ 44} "A person acts knowingly, regardless of purpose, when the person is aware that [his or her] conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). "A person has knowledge of circumstances when he [or she] is aware that such circumstances probably exist." *Id*. "To establish a pattern of conduct, there only needs to be two or more actions closely related in time." *Fouch*, 2012-Ohio-3536 at ¶ 9, citing R.C. 2903.211(D)(1). In determining what constitutes a "pattern of conduct," the trial court must take every action of the respondent into consideration even if some of the actions, in isolation, may not seem that particularly threatening. *Middletown v. Jones*, 2006-Ohio-3465, ¶ 10 (12th Dist.).

{¶ 45} R.C. 2903.211(D)(2) defines "mental distress" to mean either: (1) any

mental illness or condition that involves some temporary substantial incapacity; or (2) any mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, regardless of whether any person requested or received psychiatric treatment, psychological treatment, or other mental health services. *Wilson v. Wilson*, 2023-Ohio-4243, ¶ 24 (12th Dist.). Although constituting something more than mere mental stress or annoyance, "[m]ental distress need not be incapacitating or debilitating." *Konk v. Getts*, 2024-Ohio-1516, ¶ 15 (12th Dist.), citing *Coleman v. Razete*, 2019-Ohio-2106, ¶ 15 (10th Dist.).

<u>Appellees' CSPOs Against Appellants</u>

{¶ 46} We begin our analysis by discussing the trial court's decision to grant Appellees CSPOs against Appellants. On appeal, Appellants initially argue the protection orders are based upon "minor, trivial, or insufficient allegations of misconduct" that do not rise to the level required by the statutes. Appellants contend the incidents were "relatively juvenile and trivial and did not merit the weight and consequences of protection orders." In support, Appellants state that Appellees' evidence was not reliable or credible and should not have been admitted or relied upon.

{¶ 47} After reviewing the record, we find that the evidence presented at the hearing was sufficient to establish that Appellants knowingly engaged in a pattern of conduct that would cause Appellees to believe that Appellants will cause physical harm or mental distress to Appellees. At the hearing on Appellees' petitions, the magistrate heard testimony that, in the month prior to the filing of their petitions, Appellants repeatedly threatened and harassed Megan, her children, and Terri. This includes testimony that Appellants regularly yelled profanities and other threats at Appellees and

Megan's children; threw broken pavers and rocks at the children; threatened physical harm to Appellees and the children; nearly caused physical harm to one of the children with a motor vehicle; frequently called the police on Appellees; and used their cell phones to record Appellees and the children's daily activities. Megan and Terri testified that, based upon Appellants' actions, they are scared for their safety, as well as the safety of the children. Appellees also testified they have altered their routine to avoid contact with Appellants and have installed cameras on their home to refute Appellants' false allegations against them. They have also taken steps to ensure the children feel safe in and around their home.

{¶ 48} Although Appellants portray the above incidents as trivial, juvenile, and insignificant, we, like the trial court, find them to be sufficient evidence to support the CSPOs. That is, although name calling and taking photographs may be conduct insufficient to constitute menacing by stalking, the aggressive language and violent behaviors described by Appellees are threats of harm that warrant the issuance of a CSPO in this case.

{¶ 49} While we acknowledge Appellants' testimony explaining or denying their conduct, it was up to the trial court to determine the weight and credibility to afford Appellees' version of the events versus Appellants' version. *Bartells v. Bertel*, 2018-Ohio-21, ¶ 63 (12th Dist.). "A trier of fact is free to believe all, part, or none of the testimony of each witness." *Lazour v. Souders*, 2024-Ohio-774, ¶ 56 (12th Dist.). It is not unusual for a trial court to hear conflicting testimony from different parties. *Id*. In this case, the trial court specifically found the Appellees credible in their testimony. Appellate courts typically defer to trial courts on issues of weight and credibility because, as the trier of fact, the trial

court is better able to view the witnesses and observe their demeanor, gestures, and voice inflections, and then use those observations in weighing credibility." *Bartells* at ¶ 63.

**{¶ 50}** Furthermore, to the extent Appellants argue the excluded evidence discussed above would have refuted Appellees' claims, we reject those arguments for the same reasons discussed in their first assignment of error. Additionally, we note that Appellants do not point to any specific evidence that, if admitted, would have refuted Appellees' allegations against Appellants or "would have sustained [their] defense" as argued on appeal. Although Appellants were unable to present certain undisclosed evidence at the hearing, Gherman and Carpenter testified regarding the incidents and denied engaging in the behavior described by Appellees. The trial court was free to believe or disbelieve this testimony.

**{¶ 51}** In light of the foregoing, we find that Appellees met their burden under R.C. 2903.214 of demonstrating by a preponderance of the evidence that Appellants engaged in conduct constituting menacing by stalking. The trial court, therefore, did not err in issuing the CSPOs.

Gherman's CSPO Against Terri

**{¶ 52}** Turning to Gherman's claim that the trial court erred in denying his petition for a CSPO against Terri, we find no error in the trial court's decision.[3] In denying

---

3. We note that, in his petition, Gherman marked that he also sought a sexually oriented offense civil protection order against Terri based upon the same events. At the final hearing, Gherman limited his presentation of the evidence to his request for a CSPO. To the extent Gherman claims the trial court should have granted Gherman a sexually oriented offense civil protection order against Terri, we disagree. Not only did Gherman fail to indicate such an objection to the magistrate's decision, but he also does not raise it as an issue on appeal to this court. Even if he had properly raised the issue, the record is void of any evidence that Terri committed a sexually oriented offense against any potentially protected person as required by R.C. 2903.211.

Gherman's petition for a CSPO against Terri, the trial court found that, although Gherman proved Terri's conduct was inappropriate, annoying, and alarming, he failed to establish that she engaged in conduct constituting menacing by stalking. Gherman claims this finding was in error for similar reasons discussed above. We disagree.

{¶ 53} Applying the law as recited above, we find the trial court did not err in denying Gherman's CSPO petition against Terri. As discussed above, nearly the entire case before this court centers upon the credibility of the witnesses. The magistrate witnessed the parties' character and demeanor and assessed their credibility at the hearing. As the trier of fact, the trial court was free to draw its own conclusions about credibility and the weight to give to the testimony. In this case, the trial court opted to accord more weight to Terri's version of events than Gherman's. After reviewing the record, we have no reason to question the magistrate's credibility determinations. Finding the testimony of Terri credible, there was ample evidence to support the trial court's decision that Terri did not knowingly cause Gherman to believe she would cause him physical harm or caused him mental distress. Terri largely denied engaging in the conduct testified to by Gherman and offered reasonable explanations for the interactions they had.

{¶ 54} However, even if we accept Gherman's allegations against Terri as true and believe that Terri took a photograph of Carpenter on April 12, 2024; was present at the Alternatives to Violence office on April 17, 2024; and engaged in other behavior meant to annoy and bother Gherman, a reasonable trier of fact could find this conduct insufficient to warrant a CSPO. That is, when considering the evidence in the context of this case, including the history of conduct between the parties and their status as neighbors who live on the same street, a trier of fact could reasonably characterize Terri's behavior as

simply annoying and inconvenient to Gherman. Mere mental stress or annoyance is not the proper subject for a civil protection order. *Konk*, 2024-Ohio-1516, at ¶ 15; see *also McNaughton v. Cochenour*, 2015-Ohio-4648, ¶ 26 (4th Dist.); *Caban v. Ransome*, 2009-Ohio-1034, ¶ 29 (7th Dist.).

{¶ 55} Based upon the evidence in the record, Gherman failed to establish, by a preponderance of the evidence, that Terri's conduct constituted menacing by stalking and therefore, warranted a CSPO. Therefore, we find the trial court did not err when it denied Gherman's petition for a CSPO against Terri.

{¶ 56} Accordingly, Appellants second and third assignments of error are overruled.

{¶ 57} Assignment of error No. 4:

{¶ 58} THE TRIAL COURT ERRED IN GRANTING A CIVIL PROTECTION ORDER THAT INTERFERED WITH RESPONDENTS' LEGITIMATE HOME AND FAMILY RIGHTS.

{¶ 59} In their final assignment of error, Appellants argue the trial court abused its discretion when it granted CSPOs against them that include restrictions that "jeopardize [their] home and family," and "prohibit [them] from doing anything or going anywhere involving their own home, or their children[.]"

{¶ 60} An appellate court reviews a challenge to the scope of a CSPO under an abuse of discretion standard. *Coleman v. Razete*, 2019-Ohio-2106, ¶ 30 (1st Dist.). Following a full hearing on a petition for a CSPO, R.C. 2903.214(E)(1) permits a trial court to issue a CSPO containing "terms designed to ensure the safety and protection of the person to be protected by the protection order." Restrictions placed on the respondent in

the CSPO must bear a sufficient nexus to the conduct that the trial court is attempting to prevent. *Lazor v. Souders*, 2024-Ohio-774, ¶ 63 (12th Dist.).

{¶ 61} In this case, the magistrate issued CSPOs against Gherman and Carpenter that were adopted by the trial court. According to the terms of the CSPOs, Appellants are prohibited from entering the residence or school of any protected persons named in the orders, including Megan's children. The CSPOs further direct Appellants to stay more than 250 feet from any protected persons identified in the orders and not to initiate or otherwise have contact with those protected persons. The CSPOs include a provision clarifying that the

> order does not prohibit any person from being on public streets or sidewalks. It does prohibit any attempt at communicating with the protected persons . . . This order does not prohibit lawful security cameras placed on homes and used for the purpose of providing security. It does prohibit use of cell phones or other recording devices used for purpose of monitoring behaviors of the protected persons.

{¶ 62} After Appellants objected to the magistrate's decision, the trial court modified the terms of the CSPOs. In so doing, the trial court added the following language to the CSPOs:

> This provision shall NOT preclude [Gherman] from being at his minor daughter's school, including drop [off] and pick up from school, and shall NOT preclude [Gherman] from attending his minor daughter's school activities. [Gherman] shall NOT engage in any contact with [Appellees] or protected persons while he is present at the school or school activities . . . Further, this Order does not prohibit [Appellants] from residing in [their] residence.

After considering Appellants' objections in their entirety, the trial court incorporated the

above language into the issued CSPOs and further added that, in addition to school activities, Gherman was permitted to attend the extracurricular activities of his minor children.

{¶ 63} On appeal, Appellants claim the trial court's modifications are insufficient and that the terms of the CSPOs unreasonably interfere with Appellants' use of their own home and their activities with their family. After our review, we find no merit to Appellants claims.

{¶ 64} As an initial note, Appellants do not cite any specific condition of the CSPOs that unreasonably restricts their ability to use their home or to engage in activities with their family or children. Instead, Appellants speculate that the terms of the CSPOs could lead to arbitrary allegations from Appellees, including that Appellants "stopp[ed] on the street for too long," or "look[ed] in the wrong direction." As such, Appellants contend "the terms that prohibit [them] from doing anything or going anywhere involving their own home . . . should be excluded to allow for entirely legitimate activities." Notwithstanding Appellants' claims, the plain language of the CSPOs provides that Appellants may reside in their home, may use the public sidewalks and streets, and that Gherman may attend his daughter's extracurricular activities. Although the terms of the CSPOs restrict Appellants from engaging in or initiating contact with the persons protected by the orders, their use of their home and public amenities such as streets and sidewalks remain unrestricted. Based upon the plain language of the orders, we decline to find that the terms of the CSPOs are overly broad or unreasonably restrict Appellants' use and enjoyment of their home.

{¶ 65} Furthermore, although Appellants cite to various cases for the proposition

that civil protection order restrictions must bear a sufficient nexus to the conduct the trial court is attempting to prevent, Appellants do not set forth any argument that such a nexus does not exist in this case. Instead, Appellants focus their argument upon the unduly restrictive nature of the CSPOs terms in general. After our review, we find the terms of the CSPOs are sufficiently related to the conduct that the trial court is attempting to prevent. That is, the record demonstrates that the trial court awarded CSPOs against Appellants due to the threatening nature of their contact with Appellees and Megan's children. This includes repeated instances of name calling, threats, and electronic monitoring discussed above. Based upon the evidence produced at the hearing, it is entirely reasonable for the trial court to impose restrictions aimed at preventing this type of contact, including any contact that may occur in public spaces. As such, the trial court did not abuse its discretion in granting the CSPOs as modified.

{¶ 66} Appellants' fourth assignment of error is overruled.

### Conclusion

{¶ 67} Finding no merit to any of the arguments raised herein, we affirm the judgment of the trial court in its entirety.

PIPER and BYRNE, JJ., concur.

## JUDGMENT ENTRY

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Clinton County Court of Common Pleas for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

/s/ Robert A. Hendrickson, Presiding Judge

/s/ Robin N. Piper, Judge

/s/ Matthew R. Byrne, Judge