[Cite as *Thomason v. Thomas*, 2026-Ohio-1234.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

|  |  |  |
|---|---|---|
| BRITTNEY THOMASON, | : | CASE NO. CA2025-07-051 |
| Appellee, | : | |
| vs. | : | OPINION AND JUDGMENT ENTRY 4/6/2026 |
| WILLIAM A. THOMAS, | : | |
| Appellant. | : | |
|  | : | |

CRIMINAL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2025 CVP 00880

Brittney Thomason, pro se.

John C. Greiner, for appellant.

**O P I N I O N**

**HENDRICKSON, P.J.**

{¶ 1} Appellant, William Thomas, appeals from the trial court's decision granting a three-year civil stalking protection order ("CSPO") against him after he posted several offensive social media posts concerning appellee, Brittney Thomason. Because there was credible evidence demonstrating each element of appellee's menacing-by-stalking

claim, we affirm the trial court's issuance of the CSPO. However, we find the CSPO impermissibly broad where it effectively prohibits appellant from posting anything concerning appellee or her family during the pendency of the CSPO. Accordingly, we vacate that portion of the CSPO and remand for further proceedings consistent with this opinion.

## I. Background and Procedural History

{¶ 2} Relevant to the instant appeal, appellee and appellant became acquainted in May 2025, when appellant shared one of appellee's Facebook posts to his political Facebook page, "Change Clermont."[1] The two continued to communicate online and via telephone briefly regarding alleged misconduct at Milford High School. The relationship quickly turned sour, and on June 10, 2025, appellee petitioned the trial court for a CSPO against appellant. In her petition, appellee asserted that appellant had been posting malicious and false posts on the Change Clermont page regarding appellee, her family, and her residential cleaning business. Appellee further alleged that appellant posted a photograph of her children, as well as degrading, false, and violent commentary regarding her teenage son.

{¶ 3} According to appellee, appellant had demonstrated a pattern of volatile behavior, intimidation, and public retaliation toward her, which had harmed her and her business' reputation and caused her anxiety and social backlash within the community. As a result, appellee requested a CSPO against appellant that included provisions for no contact, no further online harassment, and the immediate removal of any and all photographs or references to her children. Appellee attached several exhibits to support her petition, including a written statement, as well as copies of several Facebook posts

---

1. It was undisputed that Thomas runs the Change Clermont Facebook page and that he made the posts relevant to the CSPO petition and the instant appeal.

from the Change Clermont page, Facebook messages discussing the posts on Change Clermont, an email from Miami Township's lieutenant of investigations, and two police reports.

{¶ 4} On June 11, 2025, a magistrate conducted an ex parte hearing on appellee's petition. After hearing testimony from appellee, the magistrate denied her request for an ex parte protection order on the basis that she failed to prove an immediate and present danger that appellant was going to harm her in some way.

{¶ 5} The matter proceeded to a full hearing before a visiting judge on July 3, 2025, during which the parties appeared pro se.[2] At the hearing, the trial court heard testimony from appellee, appellant, and Robert Peters, an acquaintance of the parties.

{¶ 6} As part of her testimony, appellee explained the events that led her to petition for a protection order, all of which involved appellant's posts on Change Clermont. The first post occurred on June 4, 2025, which included a photograph of appellee's family and contained the following caption:

> Does anyone know this Brittney Thomason lunatic? . . . Her own kid telling a female to STFU, maybe her kid needs to be put on the floor . . . I'll always do what's right, kick ass, take no prisoner. This dumb uninformed broad has no idea what she's doing. Especially being a business owner in Milford.

According to appellee, the photograph of her family was later removed, but other AI-generated photographs of her now accompany the post.

{¶ 7} The next post occurred on June 5, 2025, when appellant posted to the Change Clermont page, and implied that appellee's cleaning business was a drug trafficking front. The post included photographs of appellee's business flyer, a photograph

2. Prior to the hearing, the parties filed various motions and appellant issued several subpoenas. Ultimately, the parties proceeded by presenting testimony from each other and appellant presented testimony from Robert Peters.

of her family, and images of her husband's Arizona court records from 2007. In the post, appellant stated that appellee's "husband was charged with 'Dangerous Drug Violation'. . . That ain't for pot[,]" and that appellee's husband had pled guilty to a criminal charge. According to appellee, the point of the post was to "string together" her cleaning business and her husband's criminal record.

{¶ 8}  On June 12, 2025, appellant posted court documents pertaining to the instant matter and invited his followers to come "see how crazy [appellee and her husband] are" at the final hearing in this case. Later that day, appellant shared additional court documents from Arizona relating to appellee's husband. In those documents, the court identified appellee by the first name "Brittany," as opposed to "Brittney." Appellant then located and posted Arizona court records for a "Brittany Sullivan" and stated "you can change an A to an E and put lipstick on a pig, but it's still a disgusting, filthy pig."[3] Appellee testified this was another false claim that she was involved in alleged drug activity and an attempt to damage her reputation.

{¶ 9}  On June 28, 2025, appellant posted to his Change Clermont page additional documents relating to this case, and included a caption stating: "Update on Crazy Lady Brittany (Brittney name changes depending on which state she's in hiding from criminal family history) Thomason . . . This nut job thinks she's an attorney!" A few days later, on June 30, 2025, appellant referred to appellee as "crazy drug lady Brittney Thomason" in a post on the Change Clermont page. Appellee testified this was another implication by appellant that her business is a drug trafficking front and was an attempt to destroy her reputation and humiliate her on a public forum.

---

3. The posts on Change Clermont, as well as the record below, refers to appellee as Brittnay, Brittany, Britney, and Brittney Sullivan. Appellee stated the court records for "Brittany Sullivan" were not hers and that she had never been charged with any drug-related crimes.

{¶ 10} On July 1, 2025, appellant posted to the Change Clermont page that The Watchdog Wire would be streaming the "CPO hearing with Brittney/Brittnay (alias depending on AZ drug offense court records)[.]" Later that day, appellant posted photographs of documents he obtained from Miami Township pursuant to a subpoena duces tecum. One of those documents is titled "Supplemental Report of Continued Defamation, Harassment, and Emotional Harm," and details information pertaining to appellee's mental health, including her provider's name, her diagnosis, and her prescribed medications. Appellee testified she prepared and submitted the supplemental report to Miami Township as part of a police report. In the same post, appellant stated that appellee had

> decided to provide information that she's receiving mental therapy because of somebody posting something about her on the internet. Lol! What's great about this is now my line of questioning is completely appropriate for her to answer any questions related to her mental health history. And I can assure you we're going to get it all on the table . . . streaming for everyone to see.

{¶ 11} Thereafter, on July 2, 2025, appellant posted a photo of appellee and discussed the ex parte hearing held in this case. As part of the post, appellant included a link to the full audio from the hearing and stated that "Crazy lady Brittney was full on victim mode[,]" that appellee will "NEVER be a victim," and that she was "making [herself] look CRAZY!"

{¶ 12} Appellee testified that she asked appellant to stop contacting her and had blocked him online. Despite these efforts, appellant continued posting about appellee on the Change Clermont page. Appellee indicated that she has suffered serious mental distress due to the repeated targeted harassment from appellant and has engaged in mental health services as a result.

{¶ 13} On cross-examination, appellee acknowledged that she had engaged with appellant on his Change Clermont page prior to May 2025 and had sent appellant unsolicited messages of information concerning the situation at Milford High School. Appellee further acknowledged that appellant had not physically threatened her in any post.

{¶ 14} Appellant also testified at the hearing. Relevant to the instant appeal, appellant testified that appellee reached out to him regarding the issue at Milford High School and that she began interacting with his Facebook page. At some point, appellee accused appellant of withholding information from her and began "attacking" him and speaking badly of him to others.

{¶ 15} The situation between appellant and appellee escalated after appellee mentioned a video depicting appellant and his son.[4] Throughout the hearing, there was significant testimony regarding this video and whether appellee had shared the video with anyone. Appellee testified that she had made "tongue-in-cheek" comments regarding the video to Peters, which appellant considered to be an attack on his family. After hearing these comments, appellant dug into appellee via available public records and began posting things about her. According to appellant, the statements he made were in defense of himself and his family, as he considered appellee's statement regarding the video a valid threat to his children. Appellant testified his intent behind the posts was not to "destroy [appellee] to the point where she can't ever come back . . . [but] to prevent her from further trying to share videos of my kids and I in a very, very dark time[.]"

{¶ 16} Appellant also presented testimony from Robert Peters, an associate of the parties. Peters testified that appellee informed him that she had the video of appellant

---

4. The record indicates that the video shows appellant using physical force to reprimand his teenage son.

- 6 -

and his son. She also provided Peters with an "AI assessment," which described appellant's living room as it would have been displayed in the video. According to Peters, appellant was very upset about the video, and Peters believed that, if appellee had not threatened to share the video, appellant would not have engaged any further with her.

{¶ 17} At the close of the evidence, the parties submitted various exhibits for the court's consideration. Relevant here, appellee submitted copies of the various Facebook posts referenced in her testimony and mental distress affidavits she had previously filed with the court. The trial court took the matter under advisement and issued a written decision on July 10, 2025. In so doing, the court found that appellant

> engaged [i]n a pattern of conduct, consisting of two or more incidents, that caused [appellee] to believe that he caused mental distress to her. He released and published information regarding her mental health treatment that should have been private. He live streamed her private information and implied that she was engaged in drug trafficking. He referred to her as a crazy drug lady. He did all of this publicly, and he did it for an extended period of time. The court was able to observe her discomfort and distress just by watching her during the trial. [Appellee] is clearly in considerable fear of [appellant] and she expressed her fear of [him]. She has been in mental health treatment as a result of [appellant's] conduct toward her.

As a result, the court issued a CSPO against appellant for a period of three years.

## II. The Appeal

{¶ 18} Appellant now appeals from the trial court's decision, raising the following assignment of error for this court's review:

> THE TRIAL COURT ERRED IN GRANTING A CPO THAT SANCTIONS AND PROHIBITS APPELLANT'S SPEECH IN VIOLATION OF THE FIRST AMENDMENT TO THE UNITED STATED CONSTITUTION AND ARTICLE I, SECTION 11 OF THE OHIO CONSTITUTION.

Within his assignment of error, appellant raises four issues for review: (1) the CSPO

constitutes an unconstitutional prior restraint on speech; (2) the CSPO is overbroad and impermissibly restricts protected expression; (3) the speech does not violate R.C. 2903.211; and (4) less restrictive remedies were available. For ease of discussion, we address these issues out of order.

**a. Issuance of the CSPO**

{¶ 19} On appeal, appellant argues that the Facebook posts constituting the basis for the CSPO do not rise to the level of "menacing" or "stalking" pursuant to R.C. 2903.211. After our review, we disagree with appellant's claims.

{¶ 20} R.C. 2903.214 governs civil stalking protection orders. *Tucker v. Uhl*, 2023-Ohio-3680, ¶ 15 (12th Dist.). "The trial court must find that the elements of R.C. 2903.214(C)(1) were proven by a preponderance of the evidence in order to grant the petitioner a civil stalking protection order." *Mather v. Hilfinger*, 2021-Ohio-2812, ¶ 16 (12th Dist.). "Preponderance of the evidence" means the greater weight of the evidence, or evidence that leads the trier of fact to find that the existence of the contested fact is more probable than its nonexistence. *McGrady v. Muench*, 2019-Ohio-2677, ¶ 12 (12th Dist.). Therefore, "[w]hen assessing whether a civil stalking protection order should have been issued, the reviewing court must determine whether there was sufficient credible evidence to prove by a preponderance of the evidence that the petitioner was entitled to relief." *Fouch v. Pennington*, 2012-Ohio-3536, ¶ 9 (12th Dist.). This standard is, in essence, a review as to whether the issuance of the civil stalking protection order was against the manifest weight of the evidence. *McBride v. McBride*, 2012-Ohio-2146, ¶ 10 (12th Dist.).

{¶ 21} "The standard of review for a manifest weight challenge in a civil case is the same as that applied to a criminal case." *Dunn v. Clark*, 2016-Ohio-641, ¶ 8 (12th Dist.), citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 17. A challenge to the manifest weight of the evidence requires this court to examine whether there exists a greater amount of

credible evidence to support one side of the issue rather than the other. *Martinez v. Martinez*, 2023-Ohio-4783, ¶ 15 (12th Dist.). Therefore, when considering a manifest weight challenge, this court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created a manifest miscarriage of justice warranting reversal[.]" *Hacker v. House*, 2015-Ohio-4741, ¶ 21 (12th Dist.), citing *Eastley* at ¶ 20.

{¶ 22} However, while this court must weigh the evidence and consider the credibility of the witnesses, it is well established that a determination regarding the witnesses' credibility is primarily for the trier of fact to decide. *Gherman v. Culberson*, 2025-Ohio-4513, ¶ 42 (12th Dist.). To that end, because it is primarily the trier of fact who decides the witnesses' credibility, "[a] judgment will not be reversed as being against the manifest weight of the evidence where the judgment is supported by some competent, credible evidence going to all essential elements of the case." *Halcomb v. Greenwood*, 2019-Ohio-194, ¶ 36 (12th Dist.). Accordingly, "reversing a judgment on manifest weight grounds should only be done in exceptional circumstances, when the evidence weighs heavily against the judgment." *Jones v. Wall*, 2016-Ohio-2780, ¶ 14 (12th Dist.).

{¶ 23} Pursuant to R.C. 2903.214(C)(1), the issuance of a civil stalking protection order "requires the petitioner to establish that the respondent engaged in conduct constituting menacing by stalking." *Harnar v. Becker*, 2021-Ohio-784, ¶ 6 (12th Dist.). R.C. 2903.211(A)(1) defines "menacing by stalking" to mean engaging in a "pattern of conduct" that "knowingly" causes "another person to believe that the offender will cause physical harm to the other person" or "mental distress to the other person." More specifically, R.C. 2903.211(A)(1) states:

No person by engaging in a pattern of conduct shall knowingly

cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family or household member of the other person.

{¶ 24} "A person acts knowingly, regardless of purpose, when the person is aware that [his or her] conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). "A person has knowledge of circumstances when he [or she] is aware that such circumstances probably exist." *Id*.

{¶ 25} R.C. 2903.211(D)(2) defines "mental distress" to mean either: (1) any mental illness or condition that involves some temporary substantial incapacity; or (2) any mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, regardless of whether any person requested or received psychiatric treatment, psychological treatment, or other mental health services. *Wilson v. Wilson*, 2023-Ohio-4243, ¶ 24 (12th Dist.). Although constituting something more than mere mental stress or annoyance, "[m]ental distress need not be incapacitating or debilitating." *Kronk v. Getts*, 2024-Ohio-1516, ¶ 15 (12th Dist.), citing *Coleman v. Razete*, 2019-Ohio-2106, ¶ 15 (10th Dist.).

{¶ 26} In this case, the conduct described by appellee concerns appellant's posts on his political Facebook page. "For purposes of R.C. 2903.211, the constitutional guarantee of free speech does not include the right to cause distress or harm, and can be the subject of a CSPO when the speech is threatening or interferes with the rights of others by causing mental distress." *Coleman* at ¶ 25; *see also Morrison v. Dible*, 2025-Ohio-4415, ¶ 21-24 (3d Dist.); *Kreuzer v. Kreuzer*, 2001-Ohio-1542 (2d Dist.). That is, "[i]t is not 'within the protection of the First Amendment's guarantee of free speech to knowingly cause another to believe one will cause physical harm or mental distress to

him or her by engaging in two or more actions or incidents closely related in time.'" *Miller v. Leone,* 2024-Ohio-1325, ¶ 33 (7th Dist.), quoting *State v. Bilder*, 99 Ohio App.3d 653, 664 (9th Dist. 1994). "R.C. 2903.211 is not aimed at the expression of ideas or beliefs but rather at oppressing behavior that invades another person's privacy interests." *Coleman* at ¶ 25, citing *State v. Smith*, 126 Ohio App.3d 193, 210 (7th Dist.1998).

{¶ 27} Appellant argues that, pursuant to the above, his conduct does not rise to the level of menacing by stalking. In support, he claims appellee failed to prove that she suffered more than mere distress or discomfort as a result of his posts. He further notes that the posts were not delivered directly to appellee and did not contain a threat of physical harm to anyone.

{¶ 28} After reviewing the entire record, we find that the evidence presented at the hearing was sufficient to establish that appellant engaged in a pattern of conduct that would cause appellee to believe that appellant would cause mental distress to her. *See Z.J. v. R.M.*, 2025-Ohio-5662, ¶ 46. At the hearing on appellee's petition the trial court heard testimony that, in the month prior to the final hearing, appellant repeatedly posted about appellee, her family, and her business in a derogatory and offensive manner. Those posts insinuated that appellee is involved in criminal behavior and is mentally unstable. The posts also implied that appellee's residential cleaning business is a front for illegal activity, despite no evidence that appellee was engaged in such activities.

{¶ 29} Appellee testified that she has suffered "serious mental distress due to the repeated targeted harassment of [appellant] under the guise of his political page[.]" Appellee further explained that, as a consequence of appellant's actions, she has been diagnosed with anxiety, has sought treatment from a mental health professional, and was prescribed medication. Part of this distress stemmed from her fear of economic loss and her shame from the false allegations. Appellee stated that her clients have questioned

her regarding appellant's posts, and she fears the amount of business she has lost due to appellant's Facebook content. Appellee submitted two "mental distress affidavits" to the court, in which she averred she has experienced escalating fear, anxiety, and emotional distress due to the actions of appellant, and that she experiences panic attacks, stomach distress, and daily fear. She further averred that she is afraid to leave her home, to operate her business publicly, and to participate in the court process that is meant to protect her.

{¶ 30} Although appellant portrays the above as mere "discomfort" and "hurt feelings," we, like the trial court, find appellee's testimony sufficient to establish that she has suffered mental distress as a result of appellant's conduct. *See* R.C. 2903.211(D)(2). We likewise reject appellant's attempt to downplay his behavior as insufficient to support the CSPO simply because it did not rise to a level of physical threats against appellee. It is well settled that a person may be found guilty of menacing by stalking by engaging in a pattern of conduct that knowingly causes another person to believe that the "offender will cause physical harm to the other person . . . *or mental distress* to the other person[.]" (Emphasis added.) 2903.211(A)(1). Thus, simply because appellant's posts did not threaten physical harm to appellee does not mean his conduct cannot support a CSPO.

{¶ 31} The record further reveals that appellant knowingly caused appellee the above mental distress when he repeatedly posted regarding appellee, her business, and her family, despite her request that he stop. While we acknowledge appellant's explanation for his conduct, his explanation evidences his awareness that his conduct would probably cause appellee to suffer mental distress. Although appellant did not look to "destroy [appellee] to the point where she" could not "ever come back," he testified he meant for appellee to "back off" in response to his posts. Based upon this explanation, there is credible evidence that appellant meant for his posts on Change Clermont to

- 12 -

negatively impact appellee, and that he intended for her to see them.

{¶ 32} In light of the foregoing, we find that appellee met her burden under R.C. 2903.214 of demonstrating by a preponderance of the evidence that appellee engaged in conduct constituting menacing by stalking. The trial court, therefore, did not err in issuing the CSPO.

### b. First Amendment Implications

{¶ 33} In his remaining arguments on appeal, appellant challenges the restrictions placed on his speech by the CSPO. Specifically, appellant claims the CSPO constitutes an unconstitutional prior restraint on his right to free speech, that the terms of the CSPO are not the least restrictive remedy available, and that the CSPO impermissibly restricts his protected expression. Appellant limits his argument to the prohibition set forth in Paragraph 7 of the CSPO, which states the following:

> RESPONDENT SHALL NOT INITIATE OR HAVE ANY CONTACT with the protected persons named in this Order or their residences, businesses, places of employment, schools, day care centers, or child care providers. *Contact includes, but is not limited to*, landline, cellular or digital telephone; text; instant messaging; fax; voicemail; delivery service; *social media; blogging; writings;* electronic communications; *posting a message;* or communications by any other means directly or through another person.
>
> Respondent may not violate this Order even with the permission of a protected person.

(Emphasis added.) According to appellant, this definition of "contact" is overbroad in that it is not narrowly tailored to protect appellee from threats or harassment and instead prohibits appellant from referencing appellee in any social media post. Thus, appellant argues Paragraph 7 of the CSPO operates as a prior restraint on his speech by forbidding him from making any future statement about appellee on his Facebook page, regardless

of time, place, or context. After our review, we find merit to appellant's claims.

{¶ 34} A foundational element of United States law is that under the First Amendment, the "'government [generally] has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 65 (1983), quoting *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972). Such restrictions are "presumptively unconstitutional" and must demonstrate that they are "the least restrictive means to achieve a compelling state interest." *Bey v. Rasawehr*, 2020-Ohio-3301, ¶ 22, citing *Reed v. Gilbert*, 576 U.S. 155, 163 (2015). This standard is called "strict scrutiny." *Id*.

{¶ 35} Notably, the content of the speech can be prohibited under select circumstances including "'advocacy intended, and likely, to incite imminent lawless action; obscenity; defamation; speech integral to criminal conduct; so-called 'fighting words'; child pornography; fraud; true threats; and speech presenting some grave and imminent threat the government has the power to prevent[.]'" *Id*. at ¶ 38, quoting *United States v. Alvarez*, 567 U.S. 709, 717 (2012).[5] As noted above, Ohio's CSPO statutes, including R.C. 2903.211 and 2903.214, restrict menacing behavior that "is threatening or interferes with the rights of others by causing mental distress." *Coleman*, 2019-Ohio-2106, at ¶ 25. If the menacing behavior involves speech, however, restrictions cannot stifle the expression of the speech's content. *See id., citing State v. Smith*, 126 Ohio App.3d 193, 210 (7th Dist.1998). As this court has previously recognized, it can be difficult to determine if restrictions on speech are because of their content. *Ehlers v. Thomas*, 2024-Ohio-2531,

---

5.  Appellee characterizes appellant's posts as "defamatory," which is not protected by the First Amendment. However, the trial court did not find that the posts were defamatory before issuing the CSPO. As the Ohio Supreme Court has noted, "judicial determination that specific speech is defamatory must be made prior to any restraint." *See Bey* at ¶ 43. Additionally, appellee acknowledged that some of the information posted by appellant was true, albeit misrepresented.

¶ 16 (12th Dist.). Seemingly content-neutral restrictions, which are subject to a different legal standard, can instead be content based. *Id*.

{¶ 36} When read in context, it is apparent that the court intended for Paragraph 7 of the CSPO to limit appellant's ability to further post or otherwise communicate regarding appellee, her family, or her business. While Paragraph 7 of the CSPO does not expressly prohibit appellant from posting specific content directed to anyone other than appellee, it does forbid appellant from "contacting" appellee. As noted above, this includes any "contact" through social media, blogging, writing, or messages. In effect, this language restricts appellant's ability to post about appellee or her family, regardless of the content of the post. This is because, even if appellant's reference to appellee is directed elsewhere, such as a post to Change Clermont directed to his followers, that post can become "contact" with appellee via social media if or when appellee views the content.[6]

{¶ 37} Similar provisions restricting the content of social media posts have been deemed content-based. *See Bey*, 2020-Ohio-3301, at ¶ 33 ("a regulation of speech 'about' a specific person (or likely any other specific subject of discussion) is a regulation of the content of that speech and must therefore be analyzed as a content-based regulation"); *Ehlers* at ¶ 20 (a CSPO's order that the appellants delete and not post any social media posts which name the appellee is content-based). This is because, such restrictions require "an examination of [the communication's] content, i.e., the person(s) being discussed, to determine whether a violation has occurred and is concerned with undesirable effects that arise from the direct impact of speech on its audience or [l]isteners' reactions to speech[.]" *Ehlers* at ¶ 20, citing *Bey* at ¶ 35. Here, Paragraph 7 of

---

6. The record reflects that many of the posts underlying the CSPO were not directed at appellee, but were general posts on his Change Clermont Facebook page and included reference to appellee. Even after blocking appellant on social media, appellee continued to see posts from appellant's Facebook page.

the CSPO similarly regulates appellant's speech or communications "about" appellee, requires the same examination into its content and subject matter, and is therefore, a content-based regulation.

{¶ 38} A content-based regulation of protected speech cannot be sustained unless it is the least restrictive means to achieve a compelling state interest. *Bey* at ¶ 22, citing *Reed*, 576 U.S. at 163. Even if we assume that there is a compelling state interest in protecting civil stalking victims from fear of imminent mental distress, Paragraph 7 is not narrowly tailored to protect appellee from such harm. Instead, we agree with appellant that Paragraph 7 is an overbroad governmental restriction on speech before its actual expression, i.e., a prior restraint on speech.

{¶ 39} "The term 'prior restraint' is used 'to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur.'" *Id*. at ¶ 25, quoting *Alexander v. United* States, 509 U.S. 544, 550 (1993). The language of Paragraph 7 of the CSPO acts as a prior restraint on appellant's First Amendment right to free speech because it effectively forbids appellant from creating any future post concerning or referencing appellee. Prior restraints are "not unconstitutional per se, [but] there is a heavy presumption against their constitutional validity*." State ex rel. Toledo Blade Co. v. Henry Cty. Court of Common Pleas*, 2010-Ohio-1533, ¶ 21. As the Ohio Supreme Court noted in *Bey*, CSPO provisions that represent prior restraints are unconstitutional unless they can survive strict scrutiny. *Bey* at ¶ 50, citing *Toledo Blade Co.* at ¶ 21. More specifically, Ohio law requires such provisions to be narrowly tailored injunctions that would both protect appellee and her family, while adhering to free speech safeguards. *See Coleman*, 2019-Ohio-2106, at ¶ 34 (10th Dist.).

{¶ 40} Here, Paragraph 7 of the CSPO places an indiscriminate restriction on

appellant's speech, effectively prohibiting any comment concerning appellee. This includes potentially harmless posts in addition to statements designed to cause appellee distress. Such a provision is undoubtedly not the least restrictive means to protect appellee and her family from appellant's menacing behavior. Instead, like the unlawful CSPO regulation analyzed in *Bey*, the scope of Paragraph 7 in this case is remarkable. It effectively forbids appellant from making any reference to appellee and has no defined limits. Conceivably, anything appellant might ever post about appellee, no matter how innocuous, could subject him to proceedings for violating the CSPO if that content reaches appellee. As written, the prohibition on any "contact," including any comment, post, message, or other writing about appellee, is demonstrably overbroad, and constitutes an impermissible prior restraint on appellant's speech.

{¶ 41} Accordingly, we sustain appellant's assignment of error, in part.

### III. Conclusion

{¶ 42} Having found merit to appellant's assignment of error, we vacate Paragraph 7 of the CSPO, reverse, in part, the decision of the trial court, and remand the matter for further proceedings. As discussed above, upon remand, the trial court should revisit its definition of "contact" and issue a provision that is narrowly tailored to protect appellee and her family while observing appellant's right to free speech. Aside from Paragraph 7, the trial court's issuance of the CSPO, and all other restrictions contained within, is affirmed.

{¶ 43} Judgment affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

M. POWELL and SIEBERT, JJ., concur.

# JUDGMENT ENTRY

The assignment of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed in part, reversed in part, and remanded for further proceedings consistent with the above Opinion.

It is further ordered that a mandate be sent to the Clermont County Court of Common Pleas for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed 33% to the appellant and 67% to the appellee.

*/s/ Robert A. Hendrickson, Presiding Judge*

*/s/ Mike Powell, Judge*

*/s/ Melena S. Siebert, Judge*